UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LESLY POMPY, and

INTERVENTIONAL PAIN
MANAGEMENT ASSOCIATES, P.C.,

     Plaintiff,

*v.*

BLUE CROSS
BLUE SHIELD OF MICHIGAN,
MARC MOORE, and
BRIAN BISHOP,

     Defendants.

No. 2:19-cv-10334

LAWSON, J.
PATTI, M.J.

**JURY DEMAND**

## SECOND AMENDED COMPLAINT

Plaintiffs complain as follows:

### INTRODUCTION

1.    Under the prevailing fee-for-service model of healthcare insurance, insurance companies pay doctors for medical services rendered to patients. Like any insurance business, healthcare insurers have a financial incentive to maximize the receipt of insurance premiums from patients and to minimize payment to doctors and other healthcare providers.

2.    It is too expensive and time consuming for healthcare insurers to challenge fee-for-service claims and prescriptions on a patient-by-patient,

visit-by-visit, service-by-service basis.  So, under the guise of combating waste, fraud, and abuse, Blue Cross Blue Shield of Michigan ("BCBSM") has devised a scheme to target for criminal prosecution doctors who bill "too much" for seeing "too many" patients, who write "too many" expensive prescriptions to patients, or both.

3.    The object of this scheme is to (*a*) unlawfully recover medical expenses rightly paid to doctors for services rendered; and (*b*) wrongfully deter other doctors from serving patients or prescribing medications that are too expensive.

4.    The method by which BCBSM implements its scheme is to conspire with law enforcement officers looking to make a name for themselves and their agency to "investigate" and falsely accuse doctors of running "pills mills" and/or billing for services not rendered or not medically necessary. Doctors targeted for "investigation" are publicly raided, have their financial assets seized, and have their medical licenses and registrations to prescribe controlled substances suspended when criminally charged.  With their assets seized, unable to work, and facing charges that can carry many decades in prison, doctors are routinely pressured into accepting plea agreements that, among other things, require them to give up their seized assets.  Those assets are then split between BCBSM and the law enforcement officer's agency: "restitution" to BCBSM and "asset forfeiture" to the agency.  BCBSM recoups money to which it is not entitled, the officer is promoted or receives

– 2 –

accolades from the agency for sizeable forfeiture "haul," and the agency gets to tout itself to the public as being tough on crime.

5.      This case is about one doctor who fought back and succeeded. BCBSM conspired with Lt. Marc Moore and other law enforcement officers detailed to the Monroe Area Narcotics Team and Investigative Services ("MANTIS"), a drug task force team under the direction of the Michigan State Police, comprised of investigators from the Michigan State Police, Monroe County Sheriff's Office, and the Monroe City Police Department. They targeted Dr. Lesly Pompy—a triple board-certified doctor in anesthesiology, pain management, and addiction treatment—who long provided health care to the medically underserved community of Monroe County, Michigan.

6.      Dr. Pompy was one of only a small number of physicians in Monroe County qualified to provide pain management to patients with chronic pain from real conditions—*e.g.*, patients with cancer pain, patients who had been in catastrophic highway accidents, patients who had degenerative disc disease in their spines, and more—and who were referred by other doctors. Because of the small number of specialists in this field in Monroe County, Dr. Pompy saw more than the average number of patients—"too many" in Blue Cross's eyes.  And because the overwhelming majority of the patients needed expensive medications to alleviate and control their pain, Dr. Pompy also wrote "too many" expensive prescriptions for Blue Cross's liking.  See PX 1,

Affidavit of Det. Robert Blair ¶4.S.4 (Sept. 27, 2016) (averring that BCBSM determined Dr. Pompy to rank first in 2015 for the average number of BCBSM beneficiaries receiving "high cost medications"); PX 12, BCBSM 2014 Specialists Rank Paid Prescriber Block Analysis.

7.    Monroe County, like many communities, experienced a rise in addiction and overdose deaths due to street drugs like heroin, a type of opioid that cannot be lawfully prescribed.  Most controlled substances used in pain management are also opioids, but they are opioids that *can* be lawfully prescribed.  Doctors became easy scapegoats for law enforcement's failure to interdict heroin.

8.    These two circumstances—BCBSM looking for ways to disincentivize doctors from writing expensive medications and claw back payments made to doctors, and law enforcement officers looking to facilitate career advancement by boosting departmental coffers with forfeiture dollars through easier collars and high-profile arrests of doctors—gave birth to a conspiracy between BCBSM and MANTIS officers.  BCBSM would provide data mining and undercover support, and the officers, acting under color of authority, would provide the muscle—"shock and awe" raids of doctors' offices, the seizure of doctors' assets, and cherry-picking evidence to persuade prosecutors to indict, to scare doctors into pleading guilty, or to convince juries to convict.  The fruits of the conviction—restitution dollars to BCBSM and forfeiture dollars to MANTIS (or the agencies that staffed it)—would

serve both their purposes.  BCBSM would succeed in clawing back funds and sending a message to doctors to cut back on expensive services and medicines, while the officers would parlay the conviction and forfeiture funds into accolades and promotions.

9.    In furtherance of the conspiracy, Moore opened an "investigation" of Dr. Pompy and used James Howell, a BCBSM employee, as an undercover patient, who had a fake Michigan driver's license issued under the alias James Stewart, who obtained a fake referral from a cooperating BCBSM doctor, and who claimed to be a truck driver suffering from back pain—a common problem for truckers—to obtain prescription medication to control his pain.

10.    After Howell successfully lied to get prescriptions, BCBSM and Moore caused members of MANTIS to misrepresent facts, omit facts, and mispresent the law to a nonlawyer magistrate for the purpose of obtaining search warrants for Dr. Pompy's office, his home, and bank accounts belonging to Dr. Pompy and his medical practice, Interventional Pain Management Associates, P.C. ("IPMA").  Moore then organized a very public raid on Dr. Pompy's practice, complete with a news helicopter and a statement to the press denigrating Dr. Pompy as a pill pusher responsible for opioid addiction in the community.

11.    BCBSM and Moore first shopped the case to county prosecutors. Dr. Pompy refused a plea offer that required him, among other things, to surrender a substantial portion of the seized funds.  The case was then taken

to federal prosecutors, with BCBSM and Moore hoping that exposure to a substantial prison term under federal law would coax Dr. Pompy into capitulating.

12. Dr. Pompy steadfastly maintained his innocence and went to trial. A jury of his peers acquitted him on all counts. By this lawsuit, Plaintiffs seek to expose this corrupt scheme and the real harm it causes patients, as well as to secure compensation for the damages they have sustained.

## PARTIES

13. Plaintiff Lesly Pompy is a citizen of the United States and a citizen of the State of Michigan. He is domiciled at 533 North Monroe Street in Monroe, Michigan 48162.

14. Plaintiff Interventional Pain Management Associates, P.C., is a professional corporation organized under the laws of the State of Michigan with a registered office at 400 Galleria Officenter, Suite 500, in Southfield, Michigan 48034.

15. Defendant Blue Cross Blue Shield of Michigan is a mutual insurance company organized under the laws of the State of Michigan with headquarters at 600 East Lafayette Boulevard in Detroit, Michigan 48226. It is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans, allowing BCBSM to use the Blue Cross and Blue Shield service marks in the state of Michigan. BCBSM is the largest health insurer in Michigan and the ninth

largest insurer in the country.  It provides private health insurance to over 4.5 million insureds in Michigan—nearly half of the state's population. In about 2013, BCBSM converted from a nonprofit to a for-profit corporation.  Despite reporting a loss of annual revenue, BCBSM's chief executive officer received $16.9 million in compensation in 2022.  Reindl, Michigan Blue Cross CEO Daniel Loepp earned $17M in cash in 2022, *Detroit Free Press* (Mar. 1, 2023), https://perma.cc/UYV3-ASYF.  This, however, was a pay cut from the $19.2 million made by the same BCBSM CEO in 2018.  Noble, $19.2M paid to CEO of Blue Cross Blue Shield of Michigan, *Detroit News* (Mar. 1, 2019), https://perma.cc/PG27-EUPZ.  See also Herman, Big raises for CEOs of the big Blues plans, *Axios* (Oct. 14, 2021), https://perma.cc/7ERJ-5F9G.

16.    Defendant Marc Moore is, on information and belief, a detective first lieutenant employed by the Michigan Department of State Police ("MSP") at the state police post located at 300 Jones Avenue in Monroe, Michigan 48161.  He is sued in his personal capacity only.

17.    Defendant Brian Bishop is, on information and belief, an investigator for the United States Department of Homeland Security and was, during all or most of the time relevant to this complaint, a diversion investigator for the United States Drug Enforcement Administration ("DEA").

## JURISDICTION

18.    This action presents federal questions that arise under 18 U.S.C. §1964, 42 U.S.C. §1983, and *Bivens v. Six Unknown Named Agents of the*

*Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  The Court therefore has original subject-matter jurisdiction under Article III of the Constitution of the United States and 28 U.S.C. § 1331.

19.    The Court has supplemental subject-matter jurisdiction over pendent state law claims under 28 U.S.C. § 1367(a).

## VENUE

20.    A substantial part of the events and omissions giving rise to the claims in this Complaint occurred in the City of Monroe, a municipality located in Monroe County, Michigan.  Monroe County is within the territorial jurisdiction of the Eastern District of Michigan.  28 U.S.C. § 102(a)(1).  This Court is therefore a proper venue for this action under 28 U.S.C. § 1391(b)(2).

## GENERAL ALLEGATIONS

### A.    Dr. Pompy and IPMA

21.    Dr. Pompy was born in Haiti and came to the United States with his family when he was 12 years old.  The Pompys settled in Bedford–Stuyvesant, a small community in Brooklyn, New York, where he lived out his childhood.

22.    The two greatest influences in Dr. Pompy's life were his great-uncle, who was a Catholic priest, and the physician who made house calls to care for his great-grandmother.  Dr. Pompy was drawn to the priesthood and medicine.  After watching many neighborhood kids fall into drugs and gang

violence, Dr. Pompy decided to pursue a vocation in medicine.

23.     After graduating from City College of New York, Dr. Pompy received a scholarship to medical school and was admitted to an accelerated program. While he was attending medical school, he was mugged and shot on the streets of Brooklyn while visiting his parents; two men entered the elevator with him, one put a gun to his head, and the other pointed one at his ribs.  In a struggle with the gunmen, one of them shot Dr. Pompy in the arm before fleeing.  The bullet shattered the bone right about the elbow, causing radial nerve damage in his arm.  He was in the hospital for a week and couldn't lift his wrist for several months because of the nerve damage.

24.     Dr. Pompy underwent intensive physical therapy and was prescribed pain medication—hydrocodone—just like many of his patients, including "James Stewart."  This traumatic event forced him to deal with extreme pain.  Although the bone and nerve healed, he developed Reflex Sympathetic Dystrophy or "RSD"—just like some of his patients.  Dr. Pompy knew from personal experience what they were going through because he had gone through a similar experience in his own life and could empathize with them at a personal level; he knew what it was like to a patient himself.

25.     It took almost a year to fully heal from that bullet wound.  Yet he persevered, keeping up with his accelerated studies throughout that year.  He graduated on time from New York Medical School in 1986.

26.     After medical school, Dr. Pompy pursued anesthesia training as a resident at SUNY Brooklyn. He then performed a two-year fellowship in cardiac anesthesia at the prestigious Cleveland Clinic.

27.     Dr. Pompy passed his anesthesia boards and became a board-certified anesthesiologist by the American Board of Anesthesiology. Board certification is the highest level of accreditation within a given specialty. The anesthesiology certification is widely considered to be one of the most difficult to obtain in all of medicine.  The overall pass rate is only about 60%. Dr. Pompy passed it on his first attempt.  This certification lasts only for 10 years; anesthesiologist must continue to prove to their peers that they are still at the top of the profession.  Dr. Pompy has passed his anesthesiology boards three times.

28.     In 1991, Dr. Pompy moved to Monroe, Michigan, to become the chief of anesthesia at Mercy Memorial Hospital.

29.     By the mid-1990s, Dr. Pompy had been encountering more patients suffering from long term, chronic pain.  As a gunshot victim, who knew firsthand what it is like to experience pain for an extended period of time, Dr. Pompy wanted to help those patients better manage their pain.  So, he obtained his second board certification, this time in pain management, from the American Board of Pain Medicine in 1996.

30.     By 2002, Dr. Pompy decided to step down as chief of anesthesiology at Mercy Memorial Hospital to open IPMA.  He bought an

office suite in the hospital's office building and opened his doors to the people of Monroe County, which the federal government recognizes as a "medically underserved community."

31.    Dr. Pompy built a referral-only specialty practice at IPMA, where mostly family doctors or primary care physicians would send their hardest cases to him.  On top of seeing patients daily and often late into the evening in his hospital office, Dr. Pompy additionally worked two mornings each week at IPMA's off-campus interventional center, where he offered patients nonsurgical procedures to treat the root causes of their pain.  He also worked a Saturday each month at a surgical outpatient center owned by other doctors.

32.    Over many years of serving as a pain management doctor, Dr. Pompy came to learn that people turn to the streets to self-medicate and become addicted to illegal drugs when they can't obtain legitimate medical treatment for their pain.  This is especially true for poorer people who have difficulty affording quality care.  Folks in that condition need two kinds of help—help getting off street drugs and help getting legitimate treatment for the pain.  Having witnessed too many neighborhood kids falling into drugs while growing up, Dr. Pompy saw the destruction that addiction causes and wanted to do something to help break the cycle of addiction and help these people live their best lives.  So, in 2014, Dr. Pompy obtained his third board certification, this time in addiction medicine the American Society of Addiction Medicine.

33.   That's who Dr. Pompy was—a triple board-certified doctor with over 25 years of experience in anesthesiology, interventional pain management, and addiction medicine—when he became the target of racketeering conspiracy alleged in this complaint.

## COUNT 1
## CONSPIRACY
## 18 U.S.C. §1962(D)
*(BCBSM and Moore)*

34.   IPMA incorporates each of the prior paragraphs by reference.

35.   A private right of action exists under 18 U.S.C. §1962(d) against a person who conspired to violate 18 U.S.C. §1962(c) and injured a plaintiff's business or property by reason of an overt act of racketeering activity under 18 U.S.C. §1961(1).

36.   From about November 2015, through January 4, 2023, BCBSM and Moore conspired to injure IPMA's business and property by violating 18 U.S.C. §1962(c).

37.   The object of BCBSM and Moore's conspiracy was to abuse the criminal justice system to obtain Plaintiffs' assets under the guise of "restitution" to BCBSM and "asset forfeiture" that Moore could tout for career advancement.

38.   In furtherance of the conspiracy, BCBSM and Moore committed numerous overt acts.

– 12 –

### A.    Overt Acts

39.    BCBSM and Moore began a joint "investigation" into Dr. Pompy's prescription of controlled substances, treatment and testing methods, and billing practices.

40.    BCBSM infiltrated IPMA by sending in BCBSM Investigator James Howell as an undercover patient using the pseudonym "James Stewart."

41.    Howell surreptitiously recorded each of his visits to IPMA as "James Stewart."

### 1.    January 5, 2016

42.    On January 5, 2016, Howell visited IPMA as "James Stewart" and  sought acceptance as a new patient.  IPMA declined to accept him as a patient without a referral for pain management from another physician and completion of a new patient packet of several documents, including a comprehensive medical questionnaire of about 20 pages in length through which a prospective patient was required to provide detailed information about the history of the pain(s) that brought them to IPMA for treatment. IPMA provided "James Stewart" with the new patient packet and instructed him to return with it fully completed once he obtained the required referral.

### 2.    Obtaining and preparing false information to secure acceptance as a new patient

43.    After IPMA declined to accept "James Stewart" as a new patient without a referral for pain management from another physician, BCBSM

procured for Howell a fabricated referral for pain management for "James Stewart" from Dr. J. Alan Robertson, a cooperating BCBSM physician.  The referral was backdated.

44.    Howell also completed the new patient packet, including the questionnaire.  He fraudulently completed the forms in the new patient packet with the intent to fool Dr. Pompy that "James Stewart" was a real patient with real pain seeking real care for pain management.

45.    For example, Howell: (1) circled "joint pain–stiffness" and "back problems" on the review of systems; (2) represented that he had diagnosed with "back" and "nerves" problems; (3) answered the question "[w]here is your *pain* located" by circling "other" and writing "stiff back"; (4) described his *pain* as a stiff back; (5) represented that his *pain* was "always present, always same intensity"; (6) answered the question "[w]hat time of day is your *pain* worst" by checking the box "morning on arising" with the notation "stiffness"; (7) circled the lower back on the depiction of the human form where asked to indicate where his *pain* occurs; (8) answered the question "[w]hat makes your *pain* feel worse?" by checking the "other" box and writing in "driving," and noting on the form that he is a driver by occupation, *ibid.*; (9) represented that he did not use recreational drugs; (10) represented that he first saw a doctor for his *pain* a year earlier in 2015, *ibid.*; (11) answered the question "if you take medicines for pain, [when] do you take it" by checking the box "when needed *for pain*,"; and (12) represented that his *pain* had

– 14 –

increased since it began.  <u>PX 2</u>, Howell New Patient Packet Forms (emphases added).

### 3.   January 9, 2016

46.   On January 26, 2016, Howell returned to IPMA and submitted the fabricated referral for pain management and the fraudulently completed new patient packet for "James Stewart," along with a fake Michigan driver's license and a BCBSM insurance card.  Both the fake license and the insurance card bore the name "James Stewart."

47.   On or after January 9, 2016, in reliance on the fabricated referral for pain management and the fraudulently completed new patient packet that Howell provided, but without knowing of their falsity, Dr. Pompy authorized IPMA staff to schedule "James Stewart" for an initial patient visit.

### 4.   February 18, 2016

48.   On February 18, 2016, Howell arrived for his first visit as a new patient.  He again provided the fake license, BCBSM insurance card, or both, in connection with the visit.

49.   Howell provided a urine sample before his first visit with Dr. Pompy.  He lied to the urine collector, falsely telling her that he took Norco and Xanax under prescription.

50.   After providing a urine sample, Howell was taken to an exam room where a medical assistant, K.G., collected additional information.  Howell

informed K.G. that he was there for a refill of medication.  K.G. recognized that this was his first visit and that Dr. Pompy had not yet prescribed medications to "James Howell" (such that there could be no "refills"), so she asked him why he wanted medications and whether he was a new addiction patient or a new pain patient.  Howell told her that he was a pain patient.

51.    K.G. asked "James Stewart" what the most difficult thing was for him to do because of his pain, and he replied "move."  When she asked him where his pain was at, he said his low back.  K.G. asked if the pain travelled down his legs, and he said "no."  She performed a preliminary physical exam to isolate the area of pain.  During the exam, Howell repeatedly represented that certain areas of his body being tested were "stiff," "stiffer than s—t," and "sore."  These representations followed his initial representations that he was a pain patient and was having pain in those same areas later described as "stiff," giving the impression that "pain" and "stiffness" were synonymous to him—an impression consistent with his description of his pain as stiffness in the new patient questionnaire.

52.    After the medical assistant's preliminary examination, Dr. Pompy met with "James Stewart."  Dr. Pompy reviewed Howell's paperwork and performed a physical exam of his own.  After the exam, Dr. Pompy did not detect any immediate problems, but ordered tests based on Howell's complaints, which Howell associated with his occupation as a driver, because of the possibility of a degenerative disc disease.  Dr. Pompy also

referred him for physical therapy.  Howell asked for Norco, stating that he has no pain when he takes that medication.  Dr. Pompy refused to issue a prescription without diagnostic testing and a drug screen.

### 5.    March 9, 2021

53.    On March 9, 2016, Howell arrived for his second appointment as an IPMA patient.  It is believed he again provided the fake license, BCBSM insurance card, or both, in connection with the visit.

54.    Howell lied to a medical assistant that the purpose of his visit was to obtain refills.  After Howell volunteered that Dr. Pompy had not written him a prescription at the last visit, the medical assistant observed that Dr. Pompy had, in fact, not yet prescribed "James Stewart" any medications.  She informed him that Dr. Pompy was not going to write him a prescription at this visit because Dr. Pompy was going to be closing the office for two weeks and would be unavailable should any problems arise while he was away.  It was his practice only to renew existing prescriptions; Dr. Pompy would not prescribe new medications or change existing medications if he was planning on being away for an extended period.

55.    Howell did not meet with Dr. Pompy on this visit.  The medical assistant rescheduled his appointment to a date after Dr. Pompy returned to the office.  Howell informed the medical assistant that he would use the intervening time to go to physical therapy.

### 6. Physical therapy

56.     Howell went to physical therapy multiple times as "James Stewart" to give the impression that he was trying to follow Dr. Pompy's treatment advice.

57.     On about March 7, 2016, two days before the appointment at IPMA on March 9, 2016, Howell went unannounced to Fitness Rehab Services, Inc., in Newport, MI, to schedule an appointment as "James Stewart." PX 3, Howell Reports on Physical Therapy.

58.     Plaintiffs believe Howell selected this location because it was in Monroe County, MI.  During his first visit with Dr. Pompy on February 18, 2016, Dr. Pompy asked "James Stewart" how he had found IPMA since the referring physician was located in St. Clair Shores, MI.  Howell responded that he had friends in Monroe and that one of them had referred him to IPMA. Obtaining physical therapy services in Monroe County would support "James Stewart's" ties to the local community.

59.     On about March 15, 2016, Howell went to his first physical therapy appointment at Fitness Rehab Services.  *Ibid.*

60.     On about March 22, 2016, Howell went to his second physical therapy appointment at Fitness Rehab Services.  *Ibid.*

61.     On about March 23, 2016, Howell went to his third physical therapy appointment at Fitness Rehab Services.  *Ibid.*

62.     On about March 30, 2016, Howell went to his fourth physical

therapy appointment at Fitness Rehab Services.  *Ibid.*

### 7.   March 22, 2016

63.    On March 22, 2016, Howell arrived for his third appointment as an IPMA patient.  It is believed he again provided the fake license, BCBSM insurance card, or both, in connection with the visit.

64.    Howell completed a follow-up questionnaire, a shorter version of the more comprehensive new patient questionnaire.  On the follow-up questionnaire, Howell: (*a*) represented that his *pain* began 20 years ago, characterizing it as "stiff"; (*b*) circled "5" on a scale of 1–10 to describe the intensity of his *pain*; (*c*) represented that his *pain* had stayed the same since the last appointment; (*d*) represented that he had *pain* in his lower back, with the note "stiff"; and (*e*) circled the box labeled "other" and wrote "stiff," in response to the question "describe your *pain*," thereby representing once again that the word "stiff" meant a quality or type of pain.  PX 4, 2016-03-22 "James Stewart" Follow-up Questionnaire.

65.    Howell provided a urine sample.

66.    Howell informed a medical assistant that he had gone to physical therapy.  The medical assistant later relayed this information to Dr. Pompy in Howell's presence.

67.    After Dr. Pompy left the room, Howell asked for Norco and Xanax and specified the dosages he needed.  After leaving the room to share this request with Dr. Pompy, the medical assistant returned and informed

"James Stewart" that Dr. Pompy will not prescribe him any medication until he received an MRI report. Howell falsely stated that his insurance would not pay for an MRI. The medical assistant offered to help with a "prior authorization" request to his insurance company to obtain coverage, but Howell refused. The medical assistant explained that Dr. Pompy needed some documentation showing a need for the medicine.

### 8.    April 26, 2016

68.    On April 26, 2016, Howell arrived for his fourth appointment as an IPMA patient. It is believed he again provided the fake license, BCBSM insurance card, or both, in connection with the visit.

69.    Howell completed another follow-up questionnaire, in which he: (*a*) represented that his *pain* originally began 20 years ago; (*b*) circled "5" on a scale of 1–10 when asked to describe the intensity of his *pain*; (*c*) represented that his *pain* had "stayed the same" and was "continuous"; (*d*) represented that his *pain* was located in his lower back, with the note "stiff back"; (*e*) circled the box labeled "other" and wrote "stiff," in response to the question "describe your *pain*," thereby representing to Dr. Pompy that the word "stiff" meant a quality or type of pain; and (*f*) represented that he tried physical therapy in March 2016 and April 2016. PX 5, 2016-04-26 "James Stewart" Follow-up Questionnaire.

70.    Howell once again tells a medical assistant that he was visiting for refills, despite not having been prescribed any medication by Dr. Pompy.

– 20 –

He also falsely told her that Dr. Pompy had prescribed him Norco. The medical assistant checked the patient file and saw no dispense date. When she challenged him whether Dr. Pompy had actually prescribed Norco to "James Stewart" before, he admitted that he had not.

71.    The medical assistant informed "James Stewart" that he had tested positive for a barbiturate. Howell claimed that was "impossible." He provided another urine sample to convince everyone that he had not consumed a barbiturate as part of his effort to fraudulently obtain a prescription for a controlled substance.

72.    Faced with an apparently indigent and underinsured patient who could not obtain the MRI test necessary to explore a non-narcotic interventional approach, Dr. Pompy turned to the primary tool left to pain management doctors: prescription medication. Based on Howell's false statements that "James Stewart" had a subjective pain score of 5/10, had low back pain, and nerve problems, Dr. Pompy prescribed "James Stewart" Norco, Lyrica, and Zanaflex for a two-week trial period. Norco is a Schedule II controlled substance commonly prescribed by pain management physicians to alleviate pain. The strength of the prescription was 5-325mg, the lowest available strength. It was both an appropriate medication and strength to treat a pain score of 5/10. Lyrica is a low-risk Schedule V controlled substance commonly prescribed to treat nerve and muscle pain. Howell had complained of nerve problems in connection with his back pain in his new patient questionnaire.

Zanaflex is a non-narcotic muscle relaxer commonly prescribed for stiff muscles; it is not a controlled substance.

73.    Thereafter, Howell filled the prescriptions at a pharmacy and gave the medication to Moore, who was present at the pharmacy.

**9.    May 9, 2016**

74.    On May 9, 2016, Howell arrived for his fifth appointment as an IPMA patient.  It is believed he again provided the fake license, BCBSM insurance card, or both, in connection with the visit.

75.    Howell completed another follow-up questionnaire, in which he: (*a*) circled "5" on a scale of 1–10 when asked to describe the intensity of his *pain*; (*b*) represented that his *pain* had "stayed the same" and he experienced the pain "daily"; (*c*) represented that his *pain* was located in his lower back, with the note "stiff"; and (*d*) circled the box labeled "other" and wrote "stiffness," in response to the question "describe your *pain*," thereby once again representing to Dr. Pompy that the word "stiff" meant a quality or type of pain.  PX 6, 2016-05-09 "James Stewart" Follow-up Questionnaire.

76.    Howell provided a urine sample.

77.    Dr. Pompy determined that the result of a urine test was inconsistent with what he expected to see.  He insisted that "James Stewart" provide a urine sample before leaving and refilled his Norco prescription for only one week pending the results of the new urine sample.

– 22 –

78.     Thereafter, Howell filled the prescription at a pharmacy and gave the medication to Moore, who was present at the pharmacy.

**10.     May 17, 2016**

79.     On May 17, 2016, Howell arrived for his sixth appointment as an IPMA patient.  It is believed he again provided the fake license, BCBSM insurance card, or both, in connection with the visit.

80.     Howell completed another follow-up questionnaire, in which he: (*a*) circled "5" on a scale of 1–10 when asked to describe the intensity of his *pain*; (*b*) represented that his *pain* had "stayed the same" and he experienced the pain "daily"; (*c*) represented that his *pain* was located in his lower back, with the note "stiff"; and (*d*) circled the box labeled "other" and wrote "stiff," in response to the question "describe your *pain*," thereby once again representing to Dr. Pompy that the word "stiff" meant a quality or type of pain. <u>PX 7</u>, 2016-05-17 "James Stewart" Follow-up Questionnaire.

81.     Dr. Pompy reviewed "James Stewart's" paperwork.  Because of an error in the testing of the last urine sample, Dr. Pompy required him to provide another urine sample for testing.  Dr. Pompy prescribed "James Stewart" another one-week supply of Norco pending the results of the next urine test.

82.     Thereafter, Howell filled the prescription at a pharmacy and gave the medication to Moore, who was present at the pharmacy.

83.     Because BCBSM and Moore knew that Howell would fail the next urine test, they terminated the undercover operation to avoid Dr. Pompy ejecting "James Stewart" from IPMA.  If Dr. Pompy ejected him from IPMA, it would prevent them from obtaining seizure warrants for Plaintiffs' bank and securities accounts and persuading prosecutors to file criminal charges through which restitution and asset forfeiture could be sought.

84.     BCBSM arranged for Dr. Carl W. Christensen, a paid BCBSM consultant, to review the videos of the undercover visits and the paperwork Howell provided to IPMA and to prepare a critical report of Dr. Pompy's services to "James Stewart," the prescriptions he wrote to "James Stewart," and the claims he submitted to BCBSM for payment for those services.

85.     Dr. Christensen was an OBGYN-trained doctor who transitioned into addiction medicine after recovering from an addiction to cocaine.  He was not board certified in anesthesiology or board certified in pain management; he was unqualified to opine on the services rendered to "James Stewart."  Nor did Dr. Christensen have any special qualifications to opine on the correctness of the claims for payment made for the services rendered to "James Stewart."

86.     With Moore's knowledge, consent, and/or direction, BCBSM provided materially false, misleading, and/or incomplete information to Det. Robert Blair, a MANTIS task force officer, who was directed to prepare search warrant affidavits to support applications for search warrants directed to

– 24 –

financial institutions.  In addition to the materially false and/or misleading statements or omissions described in Section E.2 of Count 2, *infra*, which are incorporated here by reference, BCBSM Investigator Brian Zasadny and Jim Gallagher, the Manager of BCBSM's Clinical Pharmacy Fraud, Waste and Abuse program, provided cherrypicked and misleading data regarding Dr. Pompy's prescribing habits to support the false narrative that Dr. Pompy was running an illegal pill mill.

87.   BCBSM and Moore knew that the fraudulently obtained search warrants would be used to commit the pattern of racketeering activity described in Section E.2 of Count 2, *infra*, which allegations are incorporated here by reference.

88.   BCBSM and Moore's actions directly and foreseeably injured IPMA's business and property.  The seizure of its bank and/or securities accounts deprived IPMA of the use of its funds.  This, in turn, rendered IPMA largely unable to operate its business because it could not pay the costs of operating the business without access to its funds.  As a result, IPMA suffered lost profits, avoidable stock losses, and, unable to pay its accounts payable, IPMA incurred adverse civil judgments against it.  IPMA went out of business; BCBSM and Moore's actions destroyed the value of the business as a going concern.

**B.** **No statutory immunity for BCBSM**

89.    Section 4509 of the Insurance Code of the State of Michigan generally immunizes anyone cooperating with, furnishing evidence to, or providing or receiving from regarding suspected insurance to or from an authorized agency, Mich. Comp. Laws §4509, but this statutory immunity does not apply to a person acting with malice.

90.    An "authorized agency" means the Michigan Department of State Police; a county sheriff's department; a municipal police department; a federal criminal investigative department or agency; a federal, state, county, or local prosecuting authority, the Michigan Office of Financial and Insurance Regulation; or the Michigan Department of State.  Mich. Comp. Laws §500.4501(a).

91.    Multijurisdictional task forces are juridical entities that exist apart from the agencies that staff them. *Manuel v. Gills*, 481 Mich. 637, 645–649 (2008).  Although MANTIS is a law enforcement agency, it is not an "authorized agency" within the meaning of Section 4509 of the Insurance Code.

92.    Alternatively, BCBSM's conspiracy with Moore and others and its overt acts in furtherance of that conspiracy, as pleaded in Count 1, establish that BCBSM acted with malice.

93.    Alternatively, IPMA contends that RICO preempts state law immunity where the immune party participates in a pattern of racketeering

activity under the doctrine of conflict preemption under the Supremacy Clause in Article VI, Paragraph 2, of the Constitution of the United States, because the statutory immunity granted by the State of Michigan poses an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in authorizing a private right of action against those who injure another by reason of a pattern of racketeering activity.

### C.    No qualified immunity for Moore

94.    As the officer-in-charge of MANTIS, Moore had personal knowledge and direct involvement with causing Detective Blair to obtain search warrants using affidavits accusing Plaintiffs of healthcare fraud based on false statements and material omissions.

95.    Plaintiffs have a clearly established Fourth Amendment right to be free from unreasonable searches and seizures due to an insufficient showing of probable cause in obtaining the warrant for that search.  The Supreme Court has long stated: "When the Fourth Amendment['s Warrant Clause] demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing."  *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (emphasis in original).  Specifically, as to IMPA, "a business establishment … enjoys certain protections under the Fourth Amendment." See *Dow Chem. Co. v. United States*, 476 U.S. 227, 235 (1986).

96.    Moore's conduct violated clearly established law.  The materially false and/or misleading statements in the affidavits were made with Moore's

knowledge, consent, and/or direction to mislead judicial officers to paint the desired false picture that IPMA was a pill mill and engaged in a massive health insurance fraud scheme.

97.    Moore knew of, consented to, and/or directed the omission of material information from the affidavits, and these omissions were critical to the finding of probable cause for the warrants.  See *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998).  An omission is considered material if it casts doubt on the existence of probable cause.  *United States v. Hampton*, 760 F. Appx. 399, 404 (6th Cir. 2019).

98.    Without the false statements and material omissions, the affidavits would have shown the reality of Plaintiffs' practice—a pain management clinic serving the underserved community of Monroe County.

99.    A reasonable officer in Moore's position would have known that he could not obtain search warrants using affidavits accusing Plaintiffs of healthcare fraud based on false statements and material omissions without violating Plaintiffs' clearly established Fourth Amendment rights.

100.  Moore is therefore not entitled to qualified immunity.

## COUNT 2
### RACKETEERING
### 18 U.S.C. §1962(C)
(*BCBSM and Moore*)

101.  IPMA incorporates each of the prior paragraphs by reference.

102.  A private right action exists against a person, employed by or

associated with an enterprise that is engaged in or affects interstate or foreign commerce, who conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity while acting with the necessary mens rea, resulting in injury to a plaintiff's business or property, in violation of 18 U.S.C. § 1962(c).  18 U.S.C. § 1964(c).

### A.    BCBSM and Moore are persons

103.  A person includes any individual or entity capable of holding a legal or beneficial interest in property.  18 U.S.C. § 1961(3).

104.  BCBSM is an entity capable of holding a legal or beneficial interest in property.  MCL 450.1261.

105.  Moore, a natural person, is an individual capable of holding a legal or beneficial interest in property.

### B.    MANTIS was the enterprise

106.  An enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.  18 U.S.C. § 1961(4).

107.  MANTIS served as the enterprise.  MANTIS was a multijurisdictional task force that consisted of personnel from federal, state, county, and local law enforcement agencies organized to investigate unlawful drug activity.

108.  MANTIS was the successor multijurisdictional task force to the Office of Monroe Narcotics Investigations ("OMNI"), which was disbanded

after an investigation by the Michigan Department of Attorney General revealed that officers running OMNI made money off property that was confiscated during drug raids.

109.  Luke Davis, the head of OMNI, and Emmanuel Riopelle, a junior OMNI officer, pleaded guilty to seizing drugs from the streets and then reselling them back to the streets.  WWJ Staff, 2 Ex-State Cops Sentenced for Roles in Property Embezzlement Scheme, *CBS Detroit* (Aug. 10, 2013), https://perma.cc/GV5M-ZF6Y.

110.  Despite this unlawful activity happening while Moore was second-in-command of OMNI, he was promoted to lead the multijurisdictional task force, which was rebranded under the new moniker MANTIS.

### C.    The enterprise affected interstate commerce

111.  IPMA provided medical services to beneficiaries of Medicare, Medicaid, and BCBSM health care benefit programs.

112.  Medicare was a federal healthcare benefit program providing benefits to people over the age of 65 or disabled.  Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services.

113.  Medicaid was a federal and state funded healthcare program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain others who lacked adequate resources to pay for medical care.  Medicaid covered the cost of medical

services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled.  CMS was responsible for overseeing the Medicaid program in participating states, including Michigan.

114.  BCBSM was a private health insurer that provided healthcare benefits to individuals qualified under their health insurance plans issued by BCBSM.

115.  At all times relevant to this Complaint, Medicare, Medicaid, and BCBSM were "health care benefit programs," as defined in 18 U.S.C. §24(b), and were engaged in interstate commerce.

116.  Plaintiffs' provision of medical services affected interstate commerce because IPMA served beneficiaries of those health care benefit programs and served patients who resided outside of Michigan.

117.  Defendants' unlawful actions through MANTIS, culminating in the wrongful revocation of Dr. Pompy's authority to prescribe controlled substances and in the wrongful suspension of his license to practice medicine in multiple states, affected interstate commerce by impairing the provision of healthcare services to the beneficiaries of those health care benefit programs and to patients who resided outside of Michigan.

118.  Defendants' unlawful actions through MANTIS also chilled the provision of pain management services in Michigan and nationally.  Plaintiffs' pain patients were stigmatized as drug addicts seeking controlled substances

for unlawful nonmedical purposes, rather than as people with chronic pain in need of controlled substances for legitimate medical purposes; other physicians declined to treat Plaintiffs' pain patients or would only treat them with non-controlled substances inadequate to treat their pain for fear of also being targeted by MANTIS.  Some patients unable to obtain treatment or adequate treatment sought treatment elsewhere in the United States, or they turned to the illicit drug market, which is or affects interstate and foreign commence.

### D.    The defendants were employed or associated with MANTIS

119.  Moore was the officer-in-charge of MANTIS.

120.  BCBSM associated with MANTIS by assigning Howell to work with MANTIS as an undercover operative.

### E.    The defendants conducted or participated in MANTIS's affairs through a pattern of racketeering activity.

121.  "Racketeering activity" is any activity listed in 18 U.S.C. §1961(1).

122.  A "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which must have occurred after 1970 and the last of which must have occurred within 10 years after the commission of a prior act of racketeering activity. 18 U.S.C. §1961(5).

### 1.    BCBSM—Felonious Misuse of a Means of Identification

123.  An act indictable under 18 U.S.C. §1028 is an act of racketeering activity.  18 U.S.C. §1961(1)(B).

– 32 –

124.   It is an indictable offense under 18 U.S.C. §1028(a)(7) and (c)(3)(A) to knowingly use, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a felony under state law, if the use of the means of identification is in or affects interstate commerce.

125.   A "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any name, social security number, date of birth, or official state-issued driver's license.  18 U.S.C. §1028(d)(7)(A).

126.   BCBSM Investigator James Howell procured this Michigan driver's license in the name of James Samuel Stewart, which qualifies as a means of identification under 18 U.S.C. §1028(d)(7)(A):



127.   BCBSM supplied Howell with this membership card under the name James Stewart with an enrollee number and a group number, which qualifies as a means of identification under 18 U.S.C. §1028(d)(7)(A):



128.  On about January 26, 2016, Howell knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA for the purpose of being accepted as a new patient of Dr. Pompy with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

129.  On about February 18, 2016, Howell again knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA as an established patient with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

130.  On about March 9, 2016, Howell again knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA as an established patient with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

131.  On about March 22, 2016, Howell again knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA as an established patient with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

132.  On about April 26, 2016, Howell again knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA as an established patient with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

133.  On about May 9, 2016, Howell again knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA as an established patient with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

134.  On about May 17, 2016, Howell again knowingly used the name James Stewart, this driver's license, and/or this BCBSM membership card by presenting it to IPMA as an established patient with the intent to fraudulently obtain or attempt to obtain a prescription for a controlled substance from Dr. Pompy, a healthcare provider.

135.  Howell had no lawful authority to use the name James Stewart, the Stewart driver's license, or the BCBSM membership card to fraudulently

obtain or attempt to fraudulently obtain a prescription for a controlled substance.

136. Under the Michigan Public Health Code, a person who fraudulently obtains or attempts to obtain a controlled substance or a prescription for a controlled substance from a healthcare provider is guilty of a felony punishable by imprisonment for not more than four years, a maximum fine of $5,000, or both. Mich. Comp. Laws §333.7403a(1), (4).

137. Accordingly, Howell's repeated use of a means of identification to attempt to fraudulently obtain and to fraudulently obtain a prescription for a controlled substance constitutes a pattern of racketeering activity by BCBSM.

### 2. BCBSM and Moore—Bank Fraud

138. An act indictable under 18 U.S.C. § 1344 is an act of racketeering activity. 18 U.S.C. §1961(1)(B).

139. It is an indictable offense under 18 U.S.C. § 1344(2) to knowingly execute, or attempt to execute, a scheme or artifice to obtain any moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.

140. Each execution of a scheme is separately indictable under 18 U.S.C. §1344. *United States v. Sosa–Baladron*, 800 F. Appx. 313, 322–323 (6th Cir. 2020).

141.  Monroe Bank & Trust ("MBT"), Monroe County Community Credit Union ("M3CU"), E*Trade, and Merrill Lynch are financial institutions.

142.  Dr. Pompy and IPMA owned bank and/or securities accounts at all four of these financial institutions.

143.  As part of their scheme to obtain the funds and securities held in these accounts as a source for "restitution" to BCBSM and "forfeiture funds" to MANTIS or its constituent agencies, BCBSM and Moore knowingly caused Detective Robert Blair of the Monroe County Sheriff's Department, who was a MANTIS task force officer, to obtain search warrants using affidavits accusing Plaintiffs of healthcare fraud based on materially false or misleading statements and material omissions.

144.  For example, on about September 27, 2016, Blair executed an affidavit in support of an application for a search warrant to seize accounts and records from bank accounts at MBT owned by Plaintiffs.  The affidavit accused Plaintiffs of healthcare fraud and included the following materially false and/or misleading statements: (*a*) "Dr. Pompy … prescribed the most overall prescription medication of the [2,304] providers in his same specialty during [2014,]" Blair Aff. ¶4.S.1; (*b*) "Dr. Pompy … prescribed the most controlled prescription medication[s] of the [2,304] providers in his same specialty during [2014,] *id.*, at ¶4.S.2; (*c*) "Dr. Pompy … prescribed the most days['] supply of controlled prescription medication[s] of the [2,304]

providers in his same specialty during [2014,], *id.*, at ¶4.S.3; (*d*) "in 2015, 96.13% of [Dr. Pompy's] 177 patients covered by BCBSM insurance were prescribed controlled substances … a high prescribing rate for a medical doctor[,]" *id.*, at ¶4.S.5. These averments were materially misleading because Dr. Pompy was not compared to peers in the same specialty; he was compared to anesthesiologists. PX 8, BCBSM "All Meds" 2014 Prescriber Block Analysis; PX 9, BCBSM Unique Members Controlled Substances 2014 Prescriber Block Analysis; PX 10, BCBSM Rank of Controlled Substances 2014 Prescriber Block Analysis; PX 12, BCBSM Rank of Days Supply of Controlled Substances 2014 Prescriber Block Analysis. These intentionally and materially misleading comparisons were offered to support the desired conclusion for persuasive effect: "Affiant knows based on training and experience that medical doctors who prescribe high amounts of prescribed controlled medications *compared to others in their specialty* are often engaged in unlawfully prescribing controlled substances or *healthcare fraud*." Blair Aff. ¶4.S.6. Anesthesiologists primarily provide in-hospital services and prescribe limited amounts of controlled substances for acute post-surgical pain. Interventional pain management specialists primarily provide office-based services and frequently prescribe controlled substances for chronic pain, which that is often caused by uncorrectable degenerative conditions, grows worse with time, and can require stronger controlled substances and larger doses of medication to manage the pain.

145.  For further example, in the same affidavit, Blair averred that the "Current Procedural Terminology ["("CPT")] Coding Guidelines for Office Visits … lists claim codes for different types of office visits and lists the required face to face time the physician must spend with the patient when billing for that type of visit," Blair Aff. ¶4.U.1, before making these accusations: (*a*) "on 02/18/2016, BCBSM Investigator Howell stated that he spent 8 minutes with Dr. Pompy, who filed a claim of 60 minutes of face time under claim code of 99205"; (*b*) "on 03/22/2016, BCBSM Investigator Howell stated that he spent 37 seconds with Dr. Pompy, who filed a claim of 15 minutes of face time under claim code of 99213"; (*c*) "on 04/26/2016, BCBSM Investigator Howell stated that he spent 51 seconds with Dr. Pompy, who filed a claim of 15 minutes of face time under claim code 99213"; (*d*) on 05/09/2016, BCBSM Investigator Howell stated he spend 1 minute 18 seconds with Dr. Pompy, who filed a claim of 15 minutes of face time under claim code 99213"; and (*e*) "on 05/17/2016, BCBSM Investigator Howell stated that he spent 50 seconds with Dr. Pompy, who filed a claim of 15 minutes of face time under claim code 99213."  Blair Aff. ¶¶4.U.2(a)–4.U.2(e).  These were intentionally and materially false and misleading statements and/or omissions offered to support the desired conclusion for persuasive effect: "Based on Affiant's training and experience, Affiant is aware that Medical Doctors who bill insurance companies for office visits longer than actual face to face time are committing crimes under Michigan

Law."  Blair Aff. ¶5.  Billing is based on the complexity of the medical decision-making, not the time spent with the patient:  "The duration of the visit is an ancillary factor and ***does not control*** [the CPT code] to be billed unless more than 50 percent of the face-to-face time (for noninpatient service) … is spent providing counseling or coordination of care[.]"  CMS Manual Chap. 12, § 30.6.1(B) (2016) (emphasis added).  None of Howell's visits counseling or coordination of case that involved more than 50% of the face-to-face time, so time did not control the CPT code to be billed for those visits.  When time does not control, doctors bill based on seven factors: patient history, physical examination, medical decision making, counseling, coordination of care, the nature of the patient's problems, and time estimates. The first three factors—patient history, physical examination, and medical decision making—are considered key in selecting the correct billing code. Moreover, the CPT time estimates are for general practitioners, not specialists like Dr. Pompy.

146.  These intentionally and materially false and misleading statements and/or omissions persuaded non-attorney magistrate Jessica Chaffin to issue the requested search warrant, which one or more MANTIS task force officers executed on MBT.  In compliance with the warrant, MBT froze all of Dr. Pompy and IPMA's accounts, depriving Dr. Pompy and IPMA of access to their funds.

– 40 –

147.  On about September 28, 2016, Blair executed additional affidavits in support of applications for search warrants to seize records and accounts owned by Dr. Pompy at M3CU, E*Trade, and Merrill Lynch.  The affidavits contained the same intentionally and materially false and misleading statements and/or omissions found in the affidavit Blair executed in support of MBT search warrant.

148.  These intentionally and materially false and misleading statements and/or omissions persuaded District Judge Jack Vitale to issue the requested search warrants, which one or more MANTIS task force officers executed on M3CU, E*Trade, and Merrill Lynch.  In compliance with the warrant, each institution froze Dr. Pompy and IPMA's accounts, depriving Plaintiffs of access to their funds and securities.

149.  The execution of each fraudulently obtained search warrant constituted a separate execution of the scheme or artifice to obtain moneys, funds, credits, assets, securities, and other property owned by or under the custody and control of a financial institution by means of false or fraudulent pretenses or representations.  Together, they constituted a pattern of racketeering activity by BCBSM and Moore.

### F.    Injury to IPMA's business or property

150.  BCBSM and Moore's actions directly and foreseeably injured IPMA's business and property.  By sending Howell on undercover visits, BCBSM prevented IPMA from providing care to other patients.  The seizure

of its bank and/or securities accounts deprived IPMA of the use of its funds.
This, in turn, rendered IPMA largely unable to operate its business because it
could not pay the costs of operating the business without access to its funds.
As a result, IPMA suffered lost profits and, unable to pay its accounts
payable, IPMA incurred adverse civil judgments against it.  IPMA went out
of business; BCBSM and Moore's actions destroyed the value of the business
as a going concern.

### G.    No statutory immunity for BCBSM

151.   BCBSM is not entitled to statutory immunity for the reasons
pleaded in Section B of Count 1, *supra*, which are incorporated by reference.

### H.    No qualified immunity for Moore

152.    Moore is not entitled to qualified immunity for the reasons
pleaded in Section C of Count 1, *supra*, which are incorporated by reference.

### I.    Timely claim

153.   Civil RICO actions are subject to a four-year limitations period.
*Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143 (1987).

154.   This claim accrued, at the earliest, when the search warrants
were executed on MBT, M3CU, E*Trade, and Merrill Lynch on about
September 28, 2016.

155.   IPMA first asserted, or attempted to assert, this claim in the
original pleading filed in this action on February 4, 2019, a date within four

years of the earliest possible accrual date.  ECF No. 1, PageID.144, 178,
¶¶1124, B.  Although this claim was dismissed without prejudice as to IPMA
because IPMA was not represented by counsel, ECF No. 32, PageID.516–
517, neither BCBSM nor Moore is a new defendant and this is not a new claim.
Accordingly, this claim benefits from the relation-back rule in Rule 15(c)(1)(B)
of the Federal Rules of Civil Procedure as to both BCBSM and Moore.

156.   The statute of limitations is not jurisdictional, and it is "hornbook
law that limitations periods are customarily subject to equitable tolling."
*Young v. United States*, 535 U.S. 43, 49 (2002) (cleaned up).  Federal courts
may exercise equitable powers to "relieve hardships which, from time to
time, arise from a hard and fast adherence to more absolute legal rules,
which, if strictly applied, threaten the evils of archaic rigidity."  *Holland v.
Florida*, 560 U.S. 631, 650 (2010).

157.   Regardless of the date on which the claim accrued, the Court
should equitably toll the limitations period from February 4, 2019, until
April 17, 2023, the date on which counsel appeared for IPMA.  Before then,
IPMA was unable to retain counsel because of the seizure of funds caused by
the racketeering activity pleaded in this claim, and IPMA was prevented by
law from appearing and litigating this claim without assistance of counsel.
ECF No. 32, PageID.516–517.

<u>**COUNT 3**</u>
**CONSPIRACY**
**42 U.S.C. § 1983**
(*Moore Only*)

158.  Plaintiffs incorporate each of the prior paragraphs by reference.

159.  To prevail on a claim of civil conspiracy under 42 U.S.C. §1983, a person must prove that a plan existed among conspirators, who shared a conspiratorial objective to deprive the person of a constitutional right, and that an overt act in furtherance of the conspiracy caused the person injury. *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014).

160.  BCBSM and Moore conspired to deprive Plaintiffs of their right to be free from unreasonable searches and seizures under the Fourth Amendment to the Constitution of the United States.

161.  The plan to achieve this objective was to conduct the joint investigation and to obtain search warrants through materially false and/or misleading statements and material omissions, all as described in the Introduction, Count 1, and Count 2, *supra*.

162.  BCBSM and Moore, acting under color of state law, engaged in the overt acts as pleaded in Section A of Count 1 and Section E of Count 2, *supra*, in furtherance of the conspiracy.

163.  BCBSM and Moore's actions directly and foreseeably injured IPMA's business and property.  The seizure of its bank and/or securities accounts deprived Plaintiffs of the use of their funds.

164.   This left Dr. Pompy unable to pay his personal debts, resulting in adverse civil judgments against him and being forced to liquidate assets not seized to provide for his basic needs and his criminal defense.

165.   IPMA was largely unable to operate its business because it could not pay the costs of operating the business without access to its funds.  As a result, IPMA suffered lost profits and, unable to pay its accounts payable, IPMA incurred adverse civil judgments against it.  IPMA went out of business; BCBSM and Moore's actions destroyed the value of the business as a going concern.

166.   Moore is not entitled to qualified immunity for the reasons pleaded in Section C of Count 1, *supra*, which are incorporated by reference.

167.   The limitations period for claims arising under 42 U.S.C. § 1983 is three years.  *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005).

168.   As to Dr. Pompy, this claim is timely because it benefits from the relation-back rule in Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure.

169.   As to IPMA, this claim is timely because it benefits from the relation-back rule in Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure or from equitable tolling for the same reasons alleged in Section I of Count 2.

<u>**COUNT 4**</u>
**DEPRIVATION OF CIVIL RIGHT**
**42 U.S.C. § 1983**
(*Moore Only*)

170.   Plaintiffs incorporate each of the prior paragraphs by reference.

– 45 –

171.   A person is liable under 42 U.S.C. §1983 if he deprives or causes another to be deprived of a right secured by the Constitution of the United States while acting under color of state law.

172.   On information and belief, Moore, acting under color of state law, knew of, consented to, and/or directed Blair to prepare affidavits with information Moore knew to be materially false and/or misleading and with material omissions, as alleged in Section A of Count 1 and Section E of Count 2.

173.   As a result, search warrants authorizing the seizure of Plaintiffs' bank and securities accounts were fraudulently obtained and executed, violating Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the Constitution of the United States.

174.   Moore's actions directly and foreseeably injured IPMA's business and property.  The seizure of its bank and/or securities accounts deprived Plaintiffs of the use of their funds.

175.   This left Dr. Pompy unable to pay his personal debts, resulting in adverse civil judgments against him and being forced to liquidate assets not seized to provide for his basic needs and his criminal defense.

176.   IPMA was largely unable to operate its business because it could not pay the costs of operating the business without access to its funds.  As a result, IPMA suffered lost profits and, unable to pay its accounts payable,

IPMA incurred adverse civil judgments against it. IPMA went out of business; Moore's actions destroyed the value of the business as a going concern.

177.  Moore is not entitled to qualified immunity for the reasons pleaded in Section C of Count 1, *supra*, which are incorporated by reference.

178.  The limitations period for claims arising under 42 U.S.C. § 1983 is three years. *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005).

179.  As to Dr. Pompy, this claim is timely because it benefits from the relation-back rule in Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure.

180.  As to IPMA, this claim is timely because it benefits from the relation-back rule in Rule 15(c)(1)(B) of the Federal Rules of Civil Procedure or from equitable tolling for the same reasons alleged in Section I of Count 2.

## COUNT 5
### BREACH OF CONTRACT
*(BCBSM Only)*

181.  Plaintiffs incorporate each of the prior paragraphs by reference.

182.  Dr. Pompy and BCBSM were parties to the "Blue Cross and Blue Shield of Michigan Trust Network Practitioner Affiliation Agreement" (revised Jan. 2012), which constitutes a contract between Dr. Pompy and BCBSM (the "Contract"). PX 13, Contract, ¶7.10; see also ECF No. 35-2. IPMA was at least an intended third-party beneficiary to the Contract, Mich Comp. Laws § 600.1405. See *id.*, at ¶3.4f (requiring Dr. Pompy to notify BCBSM of any changes to his business—*i.e.*, IPMA).

– 47 –

183.   The Contract designates Dr. Pompy as "an approved non-exclusive preferred provider" of covered services to members of BCBSM.  *Id.*, at ¶2.1.

184.   Under the Contract, Dr. Pompy had a contractual right to provide covered services to BCBSM members.  *Id.*, at ¶3.4d.

185.   On information and belief, IPMA and BCBSM were also parties to a separate agreement under which it had a right to receive payments from BCBSM due for services rendered by Dr. Pompy under the Contract.  Plaintiffs are unable to locate a copy of the agreement but offer a "Provider Electronic Funds Transfer" printout from BCBSM, which was produced by the United States in the criminal case against Dr. Pomp, to meet the plausibility standard under Rule 8 of the Federal Rules of Civil Procedure.  PX 14, BCBSM Provider Electronic Funds Transfer.  Plaintiffs believe BCBSM has a copy of the separate agreement in its records.

186.   BCBSM had a contractual duty to pay, and Plaintiffs had a contractual right to be paid, for covered services that Dr. Pompy performed on BCBSM members.  BCBSM admits the Contract "governs payments to Plaintiffs for services rendered to Blue Cross patients."  BCBSM Mot. to Dismiss, ECF No. 35, PageID.564.

187.   The Contract contemplates that disputes may arise between BCBSM and Plaintiffs over the validity of a claim for payment for covered services and provides a comprehensive claims dispute and appeals process.

BCBSM had a right to audit claims for payment; whereas, Plaintiffs had a right to appeal adverse claim and audit determinations through BCBSM's internal process, with a right to further appeal to an independent review panel for a binding determination as to the validity of a disputed claim. *Id.* at ¶5.1.

188.   Plaintiffs were never afforded the right to exercise these procedural protections to challenge BCBSM's claim and audit determinations. Instead, BCBSM worked with MANTIS and other law enforcement to seek criminal charges against Dr. Pompy to shut down IPMA and seek restitution from him.

189.   Under Michigan law, there is an "implied promise in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Trzeciak v. Allstate Prop. & Cas. Ins. Co.*, 569 F. Supp. 3d 640, 646 (ED Mich. 2021).

190.   BCBSM had a contractual right to conduct onsite audits during regular business hours, but the exercise of that right came with a contractual duty to give "reasonable notice of dates and times" to Plaintiffs for any such audits.  See, *e.g.*, *id.*, at ¶4.2.

191.   BCBSM's undercover investigation by BCBSM Investigator James Howell, while surreptitiously recording and providing a false identity and medical history, constituted onsite audits by BCBSM.

192.   BCBSM breached its duty to give reasonable notice of the dates and times of those onsite audits.

193.   BCBSM breached its duty to pay Plaintiffs by working with MANTIS and other law enforcement to bring criminal charges against Dr. Pompy to claw back validly earned payments under the guise of "restitution."

194.   BCBSM destroyed or injured the contractual right to perform covered services and therefore the right to earn payment for those services by MANTIS and other law enforcement to bring criminal charges against Dr. Pompy, which resulted in the suspension of Dr. Pompy's medical license and the revocation of his DEA registration, and Plaintiffs' inability to receive the fruits of the contracts.

195.   BCBSM was required to provide *written* notice of termination of the Contract to Dr. Pompy.  *Id.*, at ¶6.3.  Dr. Pompy never received any written notice of termination of the Contract until Dr. Pompy's medical license was suspended on about August 7, 2017.

196.   These failures by BCBSM individually and collectively constitute breaches of the Contract.

197.   Contract claims are subject to a limitations period of six years. Mich. Comp. Laws § 600.5807(9). This contract claim accrued no earlier than September 26, 2016, when Dr. Pompy was arrested and Plaintiffs were no longer able to perform, exercise, or assert their rights under the Contract.

198. This contract claim was first asserted in the initial complaint filed on February 4, 2019. ECF No. 1-1, PageID.180. The Court dismissed IPMA's claims without prejudice for lack of counsel on April 4, 2019. ECF No. 32, PageID.516. Dr. Pompy renewed the claim in his first amended complaint filed on January 28, 2020. ECF No. 66, PageID.915–16. The Court dismissed it without prejudice for want of jurisdiction on October 27, 2020. ECF No. 105, PageID.1614–1616. The filing of the initial complaint tolled the statute of limitations.

199. As to Dr. Pompy, this claim either benefits from the relation-back rule in Rule 15(c) of the Federal Rules of Civil Procedure or it is timely because less than six years have elapsed since the date of the arrest after subtracting the tolled period.

200. As to IPMA, this claim should benefit from the relation-back rule or be equitably tolled for the same reasons as Counts 1 and 2.

201. BCBSM's breaches of the Contract damaged Plaintiffs in an amount exceeding $75,000.00.

## COUNT 6
### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONSHIPS
(*BCBSM and Moore*)

202. Plaintiffs incorporate each of the prior paragraphs by reference.

203. Plaintiffs had contractual and/or business relationships similar to the Contract with other health insurers, including at least with Aetna,

Cigna, Cofinity, the Health Alliance Plan of Michigan ("HAP"), Medicare, Medicaid, Meridian, Paramount, Priority Health, Blue Cross Complete, and Ohio Worker's Compensation (collectively, the "other healthcare insurers"), under which Plaintiffs provided healthcare services to the insureds of the health care benefit plans offered by such others health insurers.

204.  Plaintiffs submitted claims to, and were paid by, the other healthcare insurers for covered services provided to Plaintiffs' patients.

205.  The value of such claims, and the amounts paid on them, exceeded $75,000.  For example, from January 2012 to October 2016, IPMA submitted about $16.8 million in gross claims just to Medicare, Medicaid, and BCBSM. See *United States v. Pompy*, No. 2:18-cr-20454 (ED Mich.), ECF No. 41, PageID.415, ¶8.

206.  BCBSM knew of Plaintiffs' contractual or business relationships with the other healthcare insurers.  The Contract designated Dr. Pompy "as an approved *non-exclusive* preferred provider" of services to BCBSM members, Contract, at ¶2.1 (emphasis added); it is standard industry practice for physicians and medical practices like IPMA to accept a wide range of insurance plans from their patients; and, on information and belief, from its participation in the wrongful conduct pleaded in the Introduction, Count 1, and Count 2, BCBSM would have learned through its joint investigation with MANTIS that Plaintiffs accepted other forms of insurance and that they served patients who were not BCBSM members.

207.  As the officer-in-charge of MANTIS, Moore would have learned and had knowledge of Plaintiffs' contractual or business relationships with the other healthcare insurers through the joint investigation by MANTIS.

208.  Plaintiffs also had contractual and/or business relationships with insured, underinsured, and uninsured patients to provide healthcare services in exchange for payment (*e.g.*, copays, deductibles, and the fees and costs for services not covered by their respective insurance).  The value of such services, and the amounts that patients paid for them, exceeded $75,000.

209.  From its contractual and business relationship with Plaintiffs, BCBSM knew that some of its members were Plaintiffs' patients.  From its participation in the wrongful conduct pleaded in the Introduction, Count 1, and Count 2, BCBSM would have learned through its joint investigation with MANTIS that Plaintiffs accepted other forms of insurance and that they served patients who were not members of BCBSM.  BCBSM also knows that insurance plans impose deductibles and copays; this is standard industry practice.  BCBSM also knows that insurance plans do not cover all medical services and that not every patient has insurance, such that underinsured and uninsured patients pay some or all of the fees and costs of healthcare services directly to private medical offices like IPMA.

210.  By the wrongful conduct pleaded in the Introduction, Count 1, and Count 2, BCBSM and Moore intentionally and improperly interfered with Plaintiffs' contractual or business relationships with the other healthcare

insurers, and with its patient-physician relationships to wrongly claw back validly earned payments under the guise of "restitution," and to facilitate the revocation of Dr. Pompy's DEA registration and medical license to wrongly chill how other physicians practice medicine for BCBSM's financial benefit and for Moore's career advancement.

211.  BCBSM's and Moore's actions were wrongful per se.

212.  Alternatively, if BCBSM's and Moore's actions were lawful, their actions were unjustified and done with malice.

213.  BCBSM's and Moore's tortious conduct was an actual and proximate cause of the other healthcare insurers terminating their agreements with Plaintiffs, which precluded Plaintiffs from providing and being compensated for healthcare services that would otherwise have been provided to beneficiaries of those insurers.

214.  For example, on October 3, 2016, HAP summarily suspended Plaintiffs as a provider for HAP and its affiliates because of Dr. Pompy's arrest, effective immediately. PX 15, HAP Ltr. (Oct. 3, 2016).

215.  As a further example, on October 4, 2016, Paramount terminated its agreements with Plaintiffs because of Dr. Pompy's arrest, effective immediately.  PX 16, Paramount Ltr. (Oct. 4, 2016).

216.  As a further example, on August 11, 2017, Aetna terminated Plaintiffs' network participation in Aetna's Medicare Advantage products and

commercial networks because of Dr. Pompy's arrest, effective immediately. <u>PX 17</u>, Aetna Ltr. (Aug. 11, 2016).

217. As a further example, on August 11, 2017, Cofinity terminated its agreement with Plaintiffs because of the suspension of Dr. Pompy's license. <u>PX 18</u>, Cofinity Ltr. (Undated).

218. BCBSM's and Moore's tortious conduct was an actual and proximate cause of the revocation of Dr. Pompy's DEA registration, the suspension of his medical licenses in each of the states in which he was licensed to practice medicine, and the loss of his board certifications in anesthesiology and pain medicine, which prevented Plaintiffs from providing healthcare services to their patients who desired to keep Plaintiffs as their healthcare provider.

219. Plaintiffs suffered and continue to suffer the loss of millions of dollars in payments from the other healthcare insurers for covered services that could not and can no longer be rendered to the beneficiaries, resulting in lost profits.

220. Plaintiffs suffered and continue to suffer the loss of deductibles, copays, and fees and costs paid by patients for services not covered by insurance.

221. Plaintiffs suffered humiliation, sense of outrage, indignity, and injury to reputation because of BCBSM's and Moore's malicious, willful, and wanton actions, entitling him to exemplary damages.

222.  The limitations period for tortious interference claims is three years.  Mich. Comp. Laws §600.5805(3); *Blazer Foods, Inc. v. Restaurant Props., Inc.*, 259 Mich. App. 241, 253 (2003).

223.  Plaintiffs first sought damages for the termination of contracts and/or business relationships with non-BCBSM insurers in the initial complaint filed on February 4, 2019.  ECF No. 1-1, PageID.180.  The Court dismissed IPMA's claims without prejudice for lack of counsel on April 4, 2019.  ECF No. 32, PageID.516.  Dr. Pompy renewed the claim in his first amended complaint filed on January 28, 2020.  ECF No. 66, PageID.915–16.  The Court dismissed it without prejudice for want of jurisdiction on October 27, 2020.  ECF No. 105, PageID.1614–1616.  The filing of the initial complaint tolled the statute of limitations.

224.  As to Dr. Pompy, this claim should benefit from the relation-back rule.

225.  As to IPMA, this claim should benefit from the relation-back rule or be equitably tolled for the same reasons as Counts 1 and 2.

226.  BCBSM and Moore's tortious interference resulted in Plaintiffs suffering damages in an amount exceeding $75,000.00.

227.  BCBSM and Moore are joint and severally liable for these damages.

**COUNT 7**
**BIVENS CLAIM**
(*Bishop Only*)

228.   Defendant Brian Bishop was, at the time relevant to this claim, a DEA diversion investigator.

229.   On September 26, 2016, from about 10:00 a.m. to 12:00 p.m., members of MANTIS, supported by county and local enforcement agencies, executed a search warrant on Dr. Pompy's home at 533 North Monroe Street in Monroe, Michigan 48162.  Bishop did not participate in this raid on Dr. Pompy's home.

230.   The raid team searched and removed property from his home. Having broken into the home to execute the warrant, the raid team secured the home when leaving to prevent unauthorized entry.

231.   Later that same day, after the raid team finished the search, secured Dr. Pompy's home and left, Bishop entered Dr. Pompy's home without an additional search warrant.

232.   During this unlawful entry into Dr. Pompy's home, Bishop searched his belongings without Dr. Pompy's consent and seized property from the home.

233.   The property has never been returned to Dr. Pompy.

234.   Any reasonable law enforcement officer would have understood that, absent exigent circumstances, a warrantless entry into a private residence without the consent of the homeowner violates the Fourth

Amendment. "[I]n the absence of consent or exigent circumstances … [the Supreme Court of the United States has] consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." *Steagald v. United States*, 451 U.S. 204, 211 (1981).

235.  By entering Dr. Pompy's home without a warrant in the absence of exigent circumstances, Bishop violated Dr. Pompy's clearly established Fourth Amendment right to be free from unreasonable searches.

236.  Likewise, any reasonable law enforcement officer would have understood that a warrantless seizure of property from a private residence without the consent of the homeowner violates the Fourth Amendment: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980).

237.  By seizing property from Dr. Pompy's home without a warrant, Bishop violated Dr. Pompy's separate clearly established right to be free from unreasonable seizures.

238.  Dr. Pompy has been suffered damages by Bishop's violations of his Fourth Amendment rights in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Lesly Pompy and Interventional Pain Management Associates, P.C., respectfully pray that judgment enter in their favor as follows:

1.      As to Counts 1 and 2, award IPMA its actual and consequential damages, trebled pursuant to 18 U.S.C. § 1964(c), together with interest, costs, and attorneys' fees;

2.      As to Count 3 and4, award Plaintiffs their actual and consequential damages, together with interest, costs, and attorneys' fees pursuant to 42 U.S.C. §1988;

3.      As to Counts 5–6, award Plaintiffs their actual and consequential damages in an amount to be determined at trial, together with exemplary damages, interest, costs, and attorneys' fees;

4.       As to Count 7, award Dr. Pompy his actual and consequential damages in an amount to be determined at trial, together with punitive damages, interest, costs, and attorneys' fees; and

5.      Grant all other relief this Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims.

Respectfully submitted,

BUTZEL

Dated:  June 9, 2023

/s/ *Joseph E. Richotte*

JOSEPH E. RICHOTTE (P70902)
STEVEN R. EATHERLY (P81180)
Columbia Center
201 W. Big Beaver Rd. #1200
Troy, MI  48084
(248) 258-1616
richotte@butzel.com
eatherly@butzel.com
*Counsel for Plaintiff Lesly Pompy*

100293286.1