UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LESLY POMPY and INTERVENTIONAL
PAIN MANAGEMENT ASSOCIATES, P.C.,

                        Plaintiffs,                          Case Number 19-10334
v.                                                          Honorable David M. Lawson

MARC MOORE, BRIAN BISHOP, and
BLUE CROSS BLUE SHIELD OF MICHIGAN,

                        Defendants.
_____/

**OPINION AND ORDER GRANTING MOTIONS TO DISMISS,
DENYING MOTION TO STRIKE, AND DENYING MOTION FOR RELIEF
FROM ORDER AND MOTION TO FILE A THIRD AMENDED COMPLAINT**

Plaintiff Lesly Pompy, a medical doctor who specializes in anesthesiology and pain management, was indicted by a federal grand jury for controlled substance and health care fraud crimes, for which he was acquitted at trial. He had filed the present action against his antagonists who steered the investigation, without the assistance of a lawyer. The case was stayed when the indictment was returned. After the jury's favorable verdict, the stay was lifted, Dr. Pompy retained counsel, and a second amended complaint was filed. Defendant Blue Cross Blue Shield of Michigan had been dismissed from the case near its outset but was added back in the second amended complaint. Blue Cross now has moved to strike the re-pleaded allegations against it from the second amended complaint. Defendants Marc Moore and Brian Bishop — investigators in the underlying criminal proceeding — have moved to dismiss the case against them. And the plaintiff has moved for relief from the earlier order dismissing the claims against Blue Cross and seeks leave to file a third amended complaint. The proposed third amended complaint would include Dr. Pompy individually as a plaintiff in the Racketeering claims in Counts 1 and 2 against Blue Cross and Moore, beef up the allegations against defendant Moore in Count 2, join Blue Cross as

a defendant in Counts 3 and 4 (alleging civil conspiracy and civil rights violations under federal law), and add a count of common law trespass against Bishop.  The Court heard oral argument on the motions on February 21, 2024.  The defendants' motions raise several procedural and technical defenses.  However, after reviewing the allegations in the second amended complaint and the proposed third amended complaint, it is apparent that the plaintiffs have not pleaded, and will not be able to plead, facts in support of the theories of recovery that they posit.  Therefore, the Court will grant Moore's and Bishop's motions to dismiss, deny the plaintiffs' motion for relief from the order dismissing the claims against Blue Cross and for leave to amend the pleadings further, and deny Blue Cross's motion to strike as moot.

## I.  Facts and Proceedings

The facts recited below are drawn from the second amended complaint, except where, as noted, they include claims and facts stated in the proposed third amended complaint.

## A.  The Parties

Plaintiff Lesley Pompy formerly was a licensed physician in the State of Michigan.  He was the sole principal of plaintiff Interventional Pain Management Associates, P.C. (IPMA), which operated a pain management clinic in Southfield, Michigan.  After graduating from New York Medical School in 1986 and obtaining his medical license, he eventually moved to Monroe County, Michigan, where he was the chief of anesthesiology at Mercy Memorial Hospital from 1991 through 2002.  Between 1990 and 2014, he was board certified in anesthesiology, pain management, and addiction management.  In 2002, Pompy decided to step down from his hospital post, and he then established IPMA as a private clinic offering pain management to patients with difficult cases who were referred by various area physicians.

Defendant Marc Moore is an investigator with the Michigan State Police holding the rank of detective lieutenant.  During the operative timeframe he was the officer in charge of the Monroe Area Narcotics Team and Investigative Services (MANTIS), which is a "drug task force team under the direction of the Michigan State Police, comprised of investigators from the Michigan State Police, Monroe County Sheriff's Office, and the Monroe City Police Department."  2d Am. Compl. ¶ 5, ECF No. 146, PageID.2300.

Defendant Brian Bishop is an investigator with the United States Department of Homeland Security.  During the operative timeframe he was assigned as a "diversion investigator" for the Drug Enforcement Administration.

Defendant Blue Cross Blue Shield of Michigan is one of the largest private health care insurers in the State of Michigan, insuring more than 4.5 million persons.

## B. The Criminal Prosecution

The claims in the second amended and proposed third amended complaints all arise from an investigation of the prescribing practices at Dr. Pompy's pain management clinic, which in late 2016 culminated in the issuance of search warrants and the seizure of narcotics and documents from his offices, as well as seizures of his financial assets.  Dr. Pompy subsequently was charged in an indictment filed in this district with 22 counts of distributing controlled substances, 21 U.S.C. § 841(a)(1), 15 counts of health care fraud, 18 U.S.C. § 1347, and two counts of maintaining drug involved premises, 21 U.S.C. § 856(a)(1).  *See United States v. Lesly Pompy*, No. 18-20454 (E.D. Mich.).  The indictment charged Dr. Pompy with distributing narcotics by issuing bogus prescriptions to patients over a span of years from 2012 through October 2016.  The indictment alleged that Dr. Pompy's clinics served on average 60 patients per day, and on some days as many as 200 to 300 patients, and that his medical practices issued more than 4.2 million dosages of Schedule II controlled substances over the charged timeframe, in addition to more than 6 million

prescriptions for various other controlled substances.  Dr. Pompy's clinic also billed Medicare, Medicaid, and Blue Cross for many of the prescriptions and related services, which the indictment said either were medically unnecessary or not performed as claimed.  Dr. Pompy proceeded to trial, and on January 11, 2023 a jury acquitted him on all counts.

### C.  Theories of Liability

Dr. Pompy alleges in his complaints that the investigation and prosecution were instigated by Blue Cross and MANTIS (principally through Lt. Moore), in an effort to discredit Dr. Pompy and obtain windfall proceeds via restitution and forfeiture, which Blue Cross and Moore hoped would be forthcoming from the criminal proceedings.  According to Dr. Pompy, the defendants' zeal was a product of intersecting interests — on Blue Cross's part, the desire to curtail the practices of doctors who prescribed expensive medical procedures and prescriptions when treating patients suffering from intractable chronic pain; on Moore's part the desire to obtain "easy wins" and achieve career advancement through high profile raids of physicians who were publicly tarred as running "pill mill" operations fueling the rampant abuse of opioid drugs that has afflicted communities throughout the country, particularly in economically depressed regions such as the rural communities of Monroe County, Michigan.  Dr. Pompy says that the high volume of treatments administered by his legitimate practice is explained by the fact that he was one of the few physicians medically qualified to offer chronic pain treatment in the medically underserved communities from which most of his patients hailed.

According to the complaints, Blue Cross and MANTIS engaged in a conspiratorial scheme to advance trumped-up charges against legitimate physicians who, in Blue Cross's view, were in the habit of writing "too many" prescriptions for expensive pain relief medications.  To carry out the scheme, "BCBSM would provide data mining and undercover support, and [MANTIS]

officers, acting under color of authority, would provide the muscle — 'shock and awe' raids of doctors' offices, the seizure of doctors' assets, and cherry-picking evidence to persuade prosecutors to indict, to scare doctors into pleading guilty, or to convince juries to convict." 2d Am. Compl. ¶ 8, PageID.2301.  In pursuit of the scheme, Moore opened an investigation of Dr. Pompy's clinic, and Blue Cross assigned its employee, James Howell, to assist.  Among other things, Howell used a fake Michigan driver license and went to IPMA to obtain pain medications under false pretenses.  Howell lied and said that he was a truck driver who suffered occupationally related chronic back pain, and he eventually was successful in persuading Dr. Pompy to prescribe medications to treat his pain.

Dr. Pompy alleges that Blue Cross and MANTIS formed an ad hoc criminal "enterprise" when Blue Cross delegated Howell to assist in the investigation of IPMA.  In furtherance of the illegitimate investigation, Howell allegedly made numerous false statements about his medical condition and history complaining about nonexistent pain and injuries, presented a fabricated referral from another physician, used a fake driver's license, and presented a fake member identification card indicating that he was a Blue Cross beneficiary.  Howell visited IPMA for appointments eight times between January and May 2016, and each time he presented the fake credentials.  He filled out extensive patient history forms on each occasion, and each time he lied in response to numerous questions.  When he was directed to attend physical therapy, he scheduled bogus physical therapy appointments to maintain the ruse.

Dr. Pompy initially refused to prescribe prescription pain medication before having Howell undergo an MRI scan, but he relented after Howell told him that Blue Cross refused to cover the scan, and that he could not afford to pay the cost himself.  Finally, in May 2016, Dr. Pompy issued a prescription for a two-week "trial period" for Norco, Lyrica, and Zanaflex.  Howell had the

prescription filled and delivered the drugs to Moore, who was present at the pharmacy.  When he returned for a follow-up appointment, Dr. Pompy was hesitant to renew the prescription because a urine screen showed results different from those that would be expected for someone taking the previously prescribed medications.  However, he renewed the Norco prescription for one more week.  Howell again filled the prescription and conveyed the drugs to Moore.  After the second refill was obtained, Howell's participation in the undercover operation was suspended because the defendants knew that suspicion would be aroused if he was subjected to future urine tests that would expose the fact that he was not taking any of the medications prescribed.

The complaints allege that, in the course of their conspiracy, Blue Cross and Moore engaged in several predicate acts that constituted "racketeering activity" as that term is defined under 18 U.S.C. § 1961.  First, it is alleged that on each of his eight patient visits at IPMA Howell presented a fake driver's license and Blue Cross member identification card, which constitutes the crime of using a means of identification without legal authority, contrary to 18 U.S.C. § 1028(a)(7), (c)(3)(A).  "Racketeering activity" includes any crime chargeable under 18 U.S.C. § 1028, *see* 18 U.S.C. § 1961(1)(B).  Second, it is alleged that by fabricating search warrant applications supported by materially false and misleading statements, the defendants engaged in "bank fraud" contrary to 18 U.S.C. § 1344(2), which is also is a RICO predicate activity enumerated in section 1961(1)(B).  Allegedly the procurement of the warrants was intended by false pretenses to purloin the plaintiffs' funds, which were in the custody and control of a financial institutions insured by the FDIC, namely Monroe Bank & Trust and Monroe County Community Credit Union.  Third, it is alleged that the defendants also engaged in "wire fraud" contrary to 18 U.S.C. § 1343, by sending the fraudulent search warrants via email or facsimile to E*Trade and Merrill Lynch, which subsequently froze assets in the plaintiffs' accounts at those institutions.

The plaintiffs allege that defendant Moore knowingly directed and caused MANTIS task force officer Detective Robert Blair of the Monroe County Sheriff Department to include materially false and misleading statements in applications for warrants to seize the plaintiffs' funds and to search Dr. Pompy's clinic and home.  The proposed third amended complaint enumerates only two examples of such allegedly false and misleading statements.

First, it is alleged that Blair wrote in a September 27, 2016 affidavit that, during 2014, compared among all of the 2,304 medical providers in his specialty, Dr. Pompy "prescribed the most overall prescription medication," "prescribed the most controlled prescription medications," and "prescribed the most days supply of controlled prescription medications," and that in 2015 "96.13% of [Dr.] Pompy's 177 patients covered by BCBSM insurance were prescribed controlled substances," which was described by Blair as "a high prescribing rate for a medical doctor."  Dr. Pompy says those statements were materially misleading because Blair's figures were based on comparisons with anesthesiologists, who typically provide services in a hospital setting and provide treatment for acute pain from surgical procedures and other painful events of short duration, and he was not compared with peers specializing in pain management, who practice in clinical settings and often prescribe powerful narcotics for management of long-term, ongoing chronic pain conditions.

Second, it is alleged that Blair wrote in the same affidavit that Dr. Pompy submitted claims for five office visits including between 15 and 60 minutes of face-to-face time with Howell during his various appearances at the clinic, and on each occasion Howell stated that he saw Dr. Pompy face to face for far less time — on most occasions for less than one minute.  Dr. Pompy says that the insinuation that he selected improperly inflated billing designations is misleading because it disregards (1) guidance from relevant sections of the Medicare billing manual, which state that

"[t]he duration of the visit is an ancillary factor and does not control [the CPT code] to be billed unless more than 50 percent of the face-to-face time (for noninpatient service) . . . is spent providing counseling or coordination of care," (2) none of Howell's visits involved more than 50% of the total face-to-face time spent providing counseling or coordination of care, and (3) when time is not a controlling factor, the Medicare manual states that various other factors govern the selection of billing code, including "patient history, physical examination, medical decision making, counseling, coordination of care, the nature of the patient's problems, and time estimates." Dr. Pompy says, moreover, that Blair's criticism of his billing code selection was off base because the use of billing codes based on face-to-face time typically applies to physicians in general practice, not pain management specialists like Dr. Pompy.

Defendant Moore obtained search warrants from a state court magistrate to search Dr. Pompy's home and seize his personal and business funds.  The plaintiffs allege that as a result of the execution of the fraudulently obtained warrants, they suffered from the destruction of Dr. Pompy's medical practice and the seizure of more than $600,000 in personal and business funds. The plaintiffs say that Blue Cross and Moore conspired together to achieve the violation of Dr. Pompy's Fourth Amendment rights in order to enrich themselves and secure notoriety and acclaim for the high-profile prosecution of a physician.

In a separate count, the plaintiffs allege that, on September 26, 2016, after MANTIS team officers had completed the execution of a warrant at Dr. Pompy's home, they secured the premises and then left.  However, sometime later on the same day, defendant Bishop entered the home without authorization from an additional warrant, conducted a search, and seized personal property belonging to Dr. Pompy, which never was returned.  The plaintiffs contend that this second warrantless search of the home was *per se* a violation of the Fourth Amendment.

D. Procedural History

On February 4, 2019, while the criminal prosecution was still underway, Dr. Pompy filed his *pro se* complaint in this case naming himself and his clinic as plaintiffs. The case was referred to the assigned magistrate judge to conduct pretrial proceedings. On April 4, 2019, after receiving the plaintiffs' response to an order to show cause, the Court dismissed the claims brought by plaintiff IPMA, because that entity was not represented by counsel.

The case proceeded through several rounds of initial pleading challenges. On August 5, 2020, the magistrate judge recommended that the Court dismiss with prejudice all of the claims pleaded against Monroe Bank & Trust (MBT) and its several employees who were named as defendants, and also dismiss with prejudice all but one of the claims against defendant Blue Cross Blue Shield of Michigan and its affiliates and employees who were sued. The magistrate also recommended dismissing without prejudice a breach of contract claim against Blue Cross for want of subject matter jurisdiction. The plaintiffs objected, and defendant Blue Cross objected to the dismissal of the contract claim without prejudice, contending that it should be dismissed with prejudice instead. On October 27, 2020, the Court issued an opinion adopting the recommendation in its entirety, overruling the parties' objections, and dismissing all of the claims against MBT and Blue Cross with prejudice, with the exception of the contract claim that was dismissed without prejudice. The Court also adopted the magistrate judge's recommendation to stay the proceedings, since the criminal prosecution had been initiated.

On November 3, 2020, the Court adopted a second recommendation from the magistrate judge and dismissed with prejudice all of the claims against several other individuals named as defendants after the parties raised no objections. Dr. Pompy appealed that order of dismissal to the Sixth Circuit, but the appeal was dismissed for want of jurisdiction on January 21, 2021.

At the parties' request, discovery in the case was delayed while the criminal prosecution was pending.  On April 15, 2022, the magistrate judge issued an order granting the defendants' motion to extend the stay of proceedings, and also denying the plaintiff's motion for leave to file an amended complaint, on the ground that the proposed amended pleading was grossly profuse at more than 331 pages, failed to set forth a concise pleading of any discernible cause of action, and also sought to replead claims against defendants who previously had been dismissed from the case with prejudice.

After Dr. Pompy was acquitted, he retained counsel.  The magistrate judge subsequently dissolved the stay and held a status conference with the parties and their counsel.  Following that conference, the Court granted the plaintiff's request for leave to file an amended complaint.  The second amended complaint was filed on June 9, 2023, and the defendants' motions followed.  On July 28, 2023, the Court vacated the reference to the magistrate judge and scheduled the defendants' motions for oral argument, which were heard on February 21, 2024.

The second amended complaint pleads counts against defendants Blue Cross and Moore for RICO conspiracy, 18 U.S.C. § 1962(d) (Count 1), and racketeering, 18 U.S.C. § 1962(c) (Count 2) as to plaintiff IPMA, which was added back to the case.  It also pleads a claim of conspiracy to violate civil rights via 42 U.S.C. § 1983 against defendant Moore only (Count 3).  In the proposed third amended complaint, Dr. Pompy also seeks to add himself as a plaintiff in the claims against Blue Cross and add Blue Cross as a defendant on Count 3.  Count 4 pleads a claim that Moore violated his rights under the Fourth Amendment by causing search warrants to issue based on materially false and misleading information, resulting in the seizure of Dr. Pompy's funds from his and IPMA's bank accounts.  Similarly, Dr. Pompy seeks in the proposed third amended complaint to join Blue Cross as a defendant for Count 4.  In Count 5, Dr. Pompy pleads a claim

for breach of contract against Blue Cross only, alleging that Blue Cross's employment of an "undercover" investigator posing falsely as a patient violated contractual obligations in a provider agreement that required Blue Cross to give "reasonable notice" whenever it desired to exercise its privilege to conduct audits of Dr. Pompy's practice, and that Blue Cross failed to allow opportunities for its audit determinations about the legitimacy of prescriptions to be appealed through an internal grievance procedure provided for under the contract. In Count 6, the second amended complaint pleads that Moore and Blue Cross tortiously interfered with a legitimate business expectancy by causing other benefit plans besides Blue Cross to suspend Dr. Pompy and IPMA's provider relationships, based on the results of the allegedly bogus investigation. In Count 7, the second amended complaint pleads that, on September 26, 2016, defendant Bishop violated the Fourth Amendment when he entered Pompy's home without a search warrant and seized Dr. Pompy's personal property. In his proposed third amended complaint, Pompy tacks on an additional Count 8, which alleges that Bishop committed trespass contrary to Michigan state law when he entered Dr. Pompy's home to conduct the illegal search and seized Pompy's property therein.

## II.  Defendant Bishop's Motion to Dismiss

The plaintiffs base their constitutional claims against defendant Brian Bishop, a federal officer, on *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), which established a remedy against federal agents for violating the Fourth Amendment rights of individuals. Bishop argues that *Bivens* has been constricted severely and cannot be extended to cover the factual scenario in this case, and therefore the Court has no subject matter jurisdiction to entertain a claim against a federal officer. Wisely, Bishop also argues that the

second amended complaint and proposed third amended complaint do not state viable claims against him.

## A.  Subject Matter Jurisdiction

The plaintiffs allege that defendant Bishop violated their Fourth Amendment rights when he entered Dr. Pompy's home on the second occasion to search it and seize property without having obtained a second search warrant.  Bishop moves to dismiss that claim under Federal Rule of Civil Procedure 12(b)(1), arguing that the Court does not have subject matter jurisdiction to adjudicate it.  Bishop reasons that because the theoretical basis for the claim — *Bivens* — has been confined to its facts, and the pleaded facts in this case are different, there is no jurisdiction to review it.

Bishop's motion plainly presents an attack on the merits of the claims; it does not pose a sound argument that questions the Court's jurisdiction over claims against a federal officer accused of violating constitutional rights.  The Sixth Circuit has warned that attacks on the merits should not be confounded with jurisdictional challenges, admonishing courts to be more exacting when addressing challenges that are phrased as an attack on jurisdiction.  *Primax Recoveries, Inc. v. Gunter*, 433 F.3d 515, 518-19 (6th Cir. 2006) ("'Clarity would be facilitated . . . if courts and litigants used the label "jurisdictional" not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.'") (quoting *Eberhart v. United States*, 546 U.S. 12, 16 (2005) (per curiam), and citing *Kontrick v. Ryan*, 540 U.S. 443, 453 (2004)).

In most instances, a plaintiff's failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) does not deprive a federal court of subject-matter jurisdiction.  *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 89 (1998).  "Dismissal for lack of subject-matter jurisdiction . . . is proper only when the claim is so . . . 'completely devoid of merit as not to involve a federal

controversy.'" *Ibid.* However, a plaintiff must plausibly allege all jurisdictional elements. *See, e.g.*, *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014). In this case, the plaintiffs plead that defendant Bishop violated his Fourth Amendment rights by conducting a warrantless search of his residence. *Bivens* itself established that federal courts have jurisdiction to entertain such claims against federal officers for alleged violations of the Fourth Amendment prohibition on unreasonable searches and seizures.

The Supreme Court has instructed that when "a plaintiff fails to plausibly allege an element that is both a merit element of a claim and a jurisdictional element, the district court may dismiss the claim under Rule 12(b)(1) or Rule 12(b)(6)"; however, the Court should resort to dismissal for want of subject matter jurisdiction only where it "lack[s] subject-matter jurisdiction for non-merits reasons." *Brownback v. King*, --- U.S. ---, 141 S. Ct. 740, 750 n.8 (2021). Here the defendant's challenge to the Fourth Amendment claim squarely engages the merits and turns on a fact-intensive analysis of whether the circumstances, as alleged, fit within the umbra of the decisional law establishing the elements of the claim — i.e., whether the circumstances are congruent to those in which the Supreme Court previously has allowed *Bivens* claims for unreasonable searches to proceed.

In the *Bivens* context, the Sixth Circuit has rejected attempts by defendants to cloak merits challenges as attacks on the Court's jurisdiction. *E.g.*, *Koprowski v. Baker*, 822 F.3d 248, 251 (6th Cir. 2016) ("As an initial matter, we must decide whether the defendants' challenge is jurisdictional. The district court dismissed Koprowski's Eighth Amendment claim for lack of subject-matter jurisdiction. We disagree. We have jurisdiction to adjudicate claims that arise under the Constitution, including Koprowski's Eighth Amendment claim. The relevant question here is whether judicial relief is available to Koprowski for his claim.") (citing 28 U.S.C. § 1331;

*Corr. Servs. Corp. v. Malesko*, 534 U.S. 61 (2001); *Davis v. Passman*, 442 U.S. 228 (1979)).  The same reasoning applies here.  Bishop's pleading challenge properly is viewed as one attacking the merits and not the Court's subject matter jurisdiction.

### B.  Merits of the *Bivens* Claim

United States Code Title 42, Section 1983 "enables a person to seek money damages for constitutional violations by State officials," but "no analogous federal statute authorizes similar suits against federal officials."  *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 867 (6th Cir. 2022) (citing *Ziglar v. Abbasi*, 582 U.S. 120 (2017)).  In *Bivens*, the Supreme Court held that the Fourth Amendment implied a "private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001); *see Bivens*¸ 403 U.S. at 397.  The implied right of action parallels similar claims against state officials under section 1983.  To establish such a claim, a plaintiff must allege that he was "deprived of rights secured by the Constitution or laws of the United States" and that "the defendants who allegedly deprived [him] of those rights acted under color of federal law."  *Marie v. Am. Red Cross*, 771 F.3d 344, 364 (6th Cir. 2014).

But *Bivens* has fallen out of favor with the current Supreme Court, which has held that "expanding the *Bivens* remedy is now considered a 'disfavored' judicial activity."  *Ziglar v. Abbasi*, 582 U.S. 120, 121 (2017).  The Supreme Court had reasoned that implying a right of action to address Fourth Amendment violations by federal officers was intended to deter such conduct.  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001).  "But a money-damages remedy is not available for all constitutional violations by federal officers."  *Enriquez-Perdomo*, 54 F.4th at 867.  The prevailing view is that "prescribing a cause of action is a job for Congress."  *Ibid.* (quoting *Egbert v. Boule*, 596 U.S. 482, 487 (2022)).  "Since *Bivens*, the Supreme Court has only twice

extended the availability of the *Bivens* remedy: first, to a sex-discrimination claim brought against a member of Congress under the Fifth Amendment, and second, to a claim of deliberate indifference to a prisoner's medical needs brought against federal prison officials under the Eighth Amendment." *Id.* at 867-68 (citing *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980)).

Initially, Bishop contends that the Fourth Amendment claim against him must be dismissed because *Bivens* no longer is good law. He premises that argument on a strained and unduly expansive overreading of dicta in *Egbert*. He essentially asserts that there no longer is any remedy at all even for the exact same sort of search for which a remedy was recognized in *Bivens* itself, due to the accretion of decades of intervening caselaw which, according to the defendant, have all but eliminated any pathway to relief that previously existed under *Bivens* and its progeny. That stretches the language of *Egbert* too far, particularly because the *Egbert* court explicitly acknowledged that it did not need to reexamine *Bivens* in order to decide *Egbert*.

Bishop points to a concluding passage in *Egbert* where the Court wrote that "if [they] were called to decide *Bivens* today, [they] would decline to discover any implied causes of action in the Constitution." *Egbert*, 596 U.S. at 501-02 (citing *Ziglar*; collecting cases). That statement plainly was *dictum*, since the next sentence acknowledged that "to decide the case before us, we need not reconsider *Bivens* itself." *Id.* at 502. The Court also acknowledged that *Bivens could* be extended if a plaintiff "satisfies the 'analytic framework' prescribed by the last four decades of intervening case law." *Id.* at 501. As noted, the Court explicitly stated that it was not called upon to reexamine *Bivens* in order to decide the issue presented in *Egbert*. The question presented and decided by *Egbert* was whether a *Bivens* remedy should be judicially implied for constitutional violations involving cross-border interactions implicating "foreign policy" and "national security." The

Court concluded that it should not. *Id.* at 494. Bishop's gross overreading of *Egbert*'s dicta criticizing *Bivens* as a foundational holding is simply not supported by the concise reasoning of the opinion that focused squarely on the narrow question presented. Nor is it necessary to resort to such an unwarranted overreach to resolve the distinct question presented by the case before this Court, as demonstrates below.

But before examining the complaints here to determine if they plead the elements of a *Bivens* claim, the Court must address the "antecedent" question whether "[a] cause of action [is] availabl[e] under *Bivens*." *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 884-85 (6th Cir. 2021). That requires application of "a two-step inquiry." *Enriquez-Perdomo*, 54 F.4th at 868 (citing *Egbert*, 596 U.S. at 491-92). "First, a court asks whether the case presents a new *Bivens* context — i.e., is it meaningfully different from the three cases in which the Court has implied a damages action. Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed." *Ibid.* (cleaned up). "'[T]hose steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy.'" *Ibid.* (quoting *Egbert*, 596 U.S. at 492). "The *Bivens* inquiry does not invite federal courts to independently assess the costs and benefits of implying a cause of action. A court faces only one question: whether there is any rational reason (even one) to think that Congress is better suited to weigh the costs and benefits of allowing a damages action to proceed." *Egbert*, 596 U.S. at 496 (quotations omitted). "Additionally, 'a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure.'" *Enriquez-Perdomo*, 54 F.4th at 868 (quoting *Egbert*, 596 at 493).

Defendant Bishop contends that the plaintiffs cannot satisfy either step of the analysis. He argues, among other things, that the plaintiffs' claim arises in a "new context" because the circumstances of the search varied in significant ways from *Bivens* where (1) there was a valid search warrant that authorized the search of Dr. Pompy's home; (2) defendant Bishop did not handcuff Dr. Pompy, search his person, or arrest him or his family members (as occurred in *Bivens*), and the defendant could not have arrested Dr. Pompy anyway since DEA diversion officers have no arrest authority; and (3) Bishop is not a "fully commissioned law enforcement officer," unlike the defendants in *Bivens* who were sworn agents of the Federal Bureau of Narcotics (the predecessor agency to the DEA). Addressing the second step, Bishop argues that extension of the *Bivens* remedy in this instance is barred because the plaintiff had several avenues for "alternative remedies" including (a) filing a pretrial motion to suppress evidence in his federal criminal case, (b) moving to compel a return of property under Federal Rule of Criminal Procedure 41(g), (c) filing an action for damages under 31 U.S.C. § 3724(a), which provides for damages up to $50,000 for an injury or loss of property caused by an employee of the Department of Justice, and (d) pursuing a grievance through the DOJ's internal grievance procedure.

The plaintiffs characterize Fourth Amendment claim differently in an effort to bring it within *Bivens*'s scope. They say that that their second amended (and proposed third amended) complaint concedes that state police officers entered the home and conducted a search under a warrant issued by a state magistrate. He says, however, that after those officers left the premises, defendant Bishop reentered the home without a warrant, conducted his own separate search, and then seized items. The plaintiffs say that these are the same facts found in *Bivens* where federal officers entered a home and searched and seized without a warrant, and there is, therefore no need to engage in any analysis of whether this case presents a "new context." The plaintiffs cite a litany

of decisions where extension of the *Bivens* remedy was rejected, arguing that, unlike in all those cases, the distinctions in this case are trivial or illusory and do not set this case apart in any meaningful way from being on all fours with *Bivens*.

Bishop has the better argument: he has demonstrated both that the claim of an unlawful search alleged in this case implicates a "new context" under *Bivens*, and that the applicable "special factors" counsel against extending the *Bivens* remedy to this new species of claim.

### 1. New Context

In its recent decision in *Cain v. Rinehart*, No. 22-1893, 2023 WL 6439438 (6th Cir. July 25, 2023), the Sixth Circuit reaffirmed the principle that "the existence of a warrant" authorizing entry to the home suffices to distinguish a case from *Bivens* and to place it within a "new context." *Cain*, 2023 WL 6439438, at *3. In that case, federal officers entered a home to execute an arrest warrant. They did not have a search warrant authorizing home entry. But the arrest warrant, the court said, put the claim in a new context. "Although the task force members did not have a search warrant for the Glastonbury address, the arrest warrant for Mathis, who they believed resided there, gave them limited authority to enter the home. Indeed, courts in several recent cases have found that *the existence of a warrant creates a new context for* Bivens *purposes*." *Id.*, at *3 (collecting cases) (emphasis added). "[C]laims challenging warrantless searches are meaningfully different from claims concerning searches and seizures conducted pursuant to a warrant because they 'implicate[] distinct Fourth Amendment guarantee[s]' and are 'governed by different legal standards.'" *Ibid.* (quoting *Annappareddy v. Pascale*, 996 F.3d 120, 135 (4th Cir. 2021)).

The cause of action in this case occupies a grey zone between searches of a residence conducted pursuant to a search warrant issued by a judicial officer and searches conducted entirely without such authorization. It is undisputed here that a state magistrate issued a search warrant for the search of Dr. Pompy's home. Dr. Pompy does not dispute the existence of that warrant, and

he has not challenged the execution of it by other task force officers.  Instead, he takes pains in his opposition to distinguish his cause of action, arguing that the only allegedly unlawful conduct by defendant Bishop occurred when Bishop "reentered" the home after the search team had completed its canvas of the premises.  The second amended complaint alleges that the warrant team was present from 10:00 a.m. to 12:00 noon on September 26, 2016.  Second Am. Compl. ¶ 229, ECF No. 146, PageID.2354.  The team "searched and removed property from the home," and then "secured the home when leaving to prevent unauthorized entry."  *Id.* ¶ 230.  According to the complaint, "Later that same day, after the raid team finished the search, secured Dr. Pompy's home and left, Bishop entered Dr. Pompy's home without an additional search warrant." *Id.* ¶ 231.  Other than those sparse facts, no circumstances are alleged in the complaint pertaining to the scope of the search, whether the search was incomplete in any way when the warrant team departed, or how long after the "conclusion" of the search defendant Bishop's "reentry" occurred.  None of those details were added to the proposed third amended complaint, either.

The question in such circumstances is whether the "reentry" of the home constituted a reasonable continuation of the original search, which is an inquiry governed by a decidedly distinct framework of analysis compared with the seizure that occurred in *Bivens*, where there was no warrant to enter the residence.  "Most of the federal courts of appeals to have considered the question, including the Sixth Circuit, have held that *a single search warrant may authorize more than one entry into the premises identified in the warrant*, as long as the second entry is a reasonable continuation of the original search."  *United States v. Keszthelyi*, 308 F.3d 557, 568 (6th Cir. 2002) (collecting cases) (emphasis added).  Subsequent decisions have shed some additional light on the hazy interregnum between the continuation of a valid warranted search and a subsequent unauthorized warrantless entry.

- 19 -

One such case was *United States v. Bowling*, 351 F.2d 236 (6th Cir. 1965), discussed by the court of appeals in *Keszthelyi*.  In *Bowling*, the police entered the defendant's home with a warrant to search for stolen business machines. "During the search, the police identified a large number of machines they suspected to have been stolen in the defendant's basement. The police recorded the serial numbers of the machines, left the house without seizing the items, and checked the serial numbers overnight. Upon discovering that the serial numbers matched those of the stolen goods, the police returned the next day and seized the machines." *Bowling*, 351 F.3d at 241.  The court of appeals held that the search warrant authorized the second entry.  *Ibid.  Bowling* stands for the rule that a reentry on the following day may be authorized as a reasonable continuation of the search, if agents had a reason to pause and resume the search at that later time.  "*Bowling*, however, does not permit the police unlimited access to the premises identified in a warrant throughout the life of the warrant," and "[c]ourts have long recognized the dangers of official abuse that inhere in such a rule." *Keszthelyi*, 308 F.3d at 568 (quoting *Bowling*, 351 F.3d at 241).  At the least, *Bowling* establishes that a search "later the same day" reasonably could be viewed as a continuation of the original warranted search.

"[A] search conducted pursuant to a lawful warrant may last as long, and be as thorough, as reasonably necessary to fully execute the warrant.  Thus, law enforcement agents generally may continue to search the premises described in the warrant until they are satisfied that all available evidence has been located.  Once the execution of a warrant is complete, however, the authority conferred by the warrant terminates." *Keszthelyi*, 308 F.3d at 571.  The complaint here does not allege any specific facts bearing on the duration or conduct of the search, and the facts alleged do not negate the possibility that a two-hour entry was not sufficient for the defendant and other agents to be satisfied that their job in executing the warrant fully was concluded.  In *Keszthelyi*, the Sixth

Circuit found that reentry of a home on the day following a warrant execution was not a reasonable continuation because testimony affirmatively showed that the searching officers had no reason to believe that the search had not been fully completed when it was concluded after the initial entry; one officer admitted that the team could have stayed longer, that the search was "thorough," and that a drug detecting dog had been called in to aid human searchers; and the search resulted in the seizure of a wide range of items including documents, electronics equipment, some of which may have been only tangentially related to the criminal charges. *Keszthelyi*, 308 F.3d at 571.  No such distinctive facts are alleged here to establish that reentry of the home "later the same day" constituted a separate, warrantless search, rather than a reasonable continuation of the original search.

To decide the present motion, The Court need not determine the legality of the second home entry based on the pleaded allegations.  It is enough for this inquiry to observe that, as the cases above illustrate, the circumstances evoke a decidedly distinct frame of analysis from the nakedly warrantless search that was alleged in *Bivens*.  Again, the Sixth Circuit held in *Cain* that "the existence of a warrant creates a new context for *Bivens* purposes."  *Cain*, 2023 WL 6439438, at *3.  The existence of the warrant here calls for a different analysis invoking distinct rules of decision under the Fourth Amendment compared with the situation in *Bivens*.  That sets this case apart and requires the Court to proceed to the second step of the threshold inquiry.

### 2. Special Factors

Is there even a single "rational reason" to think that Congress is better equipped to conduct a cost-benefit analysis and decide that a damage remedy is warranted in the context of this case?  *See Egbert*, 596 U.S. at 496.  When considering this question, the Court must be mindful that it "may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure."  *Id.* at 493.

Here, the undisputed fact that the executive branch has set up pathways for "alternative remedies" for the alleged constitutional violation establishes that extension of the *Bivens* remedy is not warranted.  In *Cain*, the Sixth Circuit acknowledged that the authority of executive branch Inspectors General and the existence of the Attorney General's authority to settle personal injury claims under 31 U.S.C. § 3724 precluded the extension of the *Bivens* remedy to embrace a new cause of action for use of excessive force by employees of the United States Marshals Service. 2023 WL 6439438, at *4 ("Inspectors General are authorized to investigate and report abuses by federal law enforcement officers, including employees and officials of the U.S. Marshal Service, which may serve to deter misconduct. *See* 5a U.S.C. § 3. Although such alternative remedies do not allow an outside individual to participate or seek judicial review of the agency determination, *Egbert* held that similar provisions applicable to the U.S. Border Patrol precluded a *Bivens* remedy. *Egbert*, 142 S. Ct. at 1806. Further, the Attorney General is authorized under 31 U.S.C. § 3724 to settle certain claims for personal injury, death, or property damage caused by a law enforcement officer employed by the Department of Justice acting within the scope of employment, and at least one circuit court of appeals has found that this alternative remedy precluded expansion of *Bivens* to a new context.") (citing *Davis v. Dotson*, No. 20-13123, 2021 WL 5353099, at *2 (11th Cir. Nov. 17, 2021).  Bishop asserts — and the plaintiff does not dispute — that similar pathways for alternative remedies are applicable to Bishop's conduct in this case.  The directive of *Egbert* here is plain: "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy";  "[t]hat is true even if a court independently concludes that the Government's procedures are 'not as effective as an individual damages remedy.'"  *Egbert*,

596 U.S. at 498 (quoting *Bush*, 462 U.S. at 372).  Just as in *Egbert* and *Cain*, extension of the *Bivens* remedy is not justified here.

## C.  Proposed Trespass Claim

In his proposed third amended complaint, the plaintiffs seek to tack onto their pleadings a state law claim of trespass against defendant Bishop as an alternative theory of recovery for the same allegedly warrantless search on which their *Bivens* claim is based.  Several obstacles hinder that endeavor.  For one, common law tort suits against federal officers categorically are barred unless properly brought against the United States under the Federal Tort Claims Act.  The Supreme Court explained that in response to its "recogni[tion] of the continuing viability of state-law tort suits against federal officials [in] *Westfall v. Erwin*, 484 U.S. 292 (1988), . . . . Congress passed the so-called Westfall Act, formally the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679. That Act makes the Federal Tort Claims Act (FTCA) 'the exclusive remedy for most claims against Government employees arising out of their official conduct.'"  *Hernandez v. Mesa*, --- U.S. ---, 140 S. Ct. 735, 748 (2020) (quoting *Hui v. Castaneda*, 559 U.S. 799, 806 (2010)).  "In the Westfall Act, Congress provided for absolute immunity from common law tort suits for federal employees acting within the scope of their employment." *Laible v. Lanter*, 91 F.4th 438, 448 (6th Cir. 2024) (citing 28 U.S.C. § 2679(b)(1)). It is undisputed that Bishop was acting within the scope of his employment as a federal officer, and no claim under the FTCA has been pleaded, nor has the United States been named as a defendant in this suit.

The plaintiffs contend that this obstacle can be avoided under a theory articulated in a concurring opinion in *Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023), in which Judge Walker of the D.C. Circuit questioned whether the Westfall Act might permit some common law suits in

certain circumstances.  *Id.* at 1017-18.  Judge Walker acknowledged that the Westfall Act declared that an action under the Federal Tort Claims Act is the exclusive remedy for redress of personal injury claims based on "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."  *Id.* at 1016 (citing 28 U.S.C. § 2679(b)(1)).  But he says that the Act does not "preclude" an action against a federal employee "which is brought for a violation of the Constitution of the United States."  *Ibid.* (citing 28 U.S.C. § 2679(b)(2)(A)).

How could a state tort action fit that exception?  After all, the first section of the Act pretty clearly covers all actions against government employees for injury or property loss — which would include all state law tort claims — and deems the remedy under that statute "exclusive."  An action for trespass, as the plaintiffs contemplate here, plainly is a state tort claim.  *See Moher v. United States*, 875 F. Supp. 2d 739, 755, 2012 WL 2089849 (W.D. Mich. 2012) (citing *Amoco Pipeline Co. v. Herman Drainage Systems, Inc.*, 212 F. Supp. 2d 710, 720 (W.D. Mich. 2002); *Giddings v. Rogalewski*, 192 Mich. 319, 158 N.W. 951, 953 (1916)).  And, as mentioned earlier, Congress passed the Westfall Act to immunize federal officers from civil suits after the Supreme Court held that tort claims against federal officials could be brought under state law.  *Hernandez* 140 S. Ct. at 748; *Laible*, 91 F.4th at 448 (citing 28 U.S.C. § 2679(b)(1)).

But Judge Walker suggests that the exception in subsection 2679(b)(2)(A) "may allow state tort suits 'brought for' constitutional violations to proceed."  *Buchanan*, 71 F.4th at 1016.  He reasons that, "[o]n a broad reading of the exception, a suit might count as 'brought for a violation of the Constitution' if its *purpose* is to remedy a constitutional violation.  For instance, a state trespass suit could proceed if its goal was to remedy an unconstitutional search."  *Ibid.*  Parsing

the language, Judge Walker finds a difference between suits "brought for" a violation of the Constitution and suits "arising under" the Constitution. *Id.* at 1017.

As far as the Court can determine, that reasoning has not caught on elsewhere. That may be because, as Judge Walker suggested, a state tort action does not "arise under" the Constitution or federal law. Unless the parties are diverse, the plaintiffs could not bring that claim in federal court, since federal law would not create the cause of action, *see American Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916), and the plaintiff's right to relief would not necessarily depend on resolution of a substantial question of federal law, *see Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 27-28 (1983); *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir. 1990). Bishop likely would raise the defense of justification by arguing that he had a valid search warrant to enter the house, but complaints that anticipate federal defense are not sufficient to establish "arising under" jurisdiction. *Taylor v. Anderson*, 234 U.S. 74 (1914). Any such claim would find no home in a federal courthouse. That fate likely would befall any state tort claim that was "brought for" a Constitutional violation where the Constitution does not provide relief or create the cause of action itself.

Judge Walker candidly acknowledged this difficulty. He allowed that his reading of the statutory exception may be "too broad." *Buchanan*, 71 F.4th at 1016. But he maintained that even "[o]n a narrower reading, a suit might count as 'brought for a violation of the Constitution' if a constitutional violation is part of the plaintiff's cause of action." *Ibid.* He hastened to add, though that such a "reading would preclude most state tort suits — a constitutional violation is not part of a trespass action, for example . . . ." *Ibid.* And that is what we have here.

As for the trespass claim itself as stated in the proposed third amended complaint, under Michigan law, "[t]here must be an intent by the defendant to trespass," and "[t]he trespasser must

intend to enter or intrude on the plaintiff's land or real property without authorization to do so." *Moher*, 875 F. Supp. 2d at 755 (citing *Amoco Pipeline*, 212 F. Supp. 2d at 720; *Terlecki v. Stewart*, 278 Mich. App. 644, 754 N.W.2d 899 (Mich. Ct. App. 2008)). The facts alleged here suggest that, at most, Bishop may have erred in construing the temporal scope of the authorization granted by the search warrant; no facts at all have been alleged suggesting that Bishop *knew* that the reentry of the home *was not authorized* by the warrant in the first instance, and it is undisputed (and expressly alleged) that his entry was premised in the first instance on the authority of that warrant. Moreover, for reasons discussed below, the search warrant that authorized the entry was issued based on a sufficient showing of probable cause, so there is no basis for any inference that Bishop should have known that the entry was premised on an invalid warrant.

The proposed trespass claim against Bishop would be futile. The pleaded claims against him are fatally flawed. Bishop's motion to dismiss will be granted, and the motion to amend to add the trespass claim will be denied.

### III.  Defendant Moore's Motion to Dismiss

Defendant Marc Moore argues that the plaintiffs' claims for violations of RICO and the Fourth Amendment, civil conspiracy, and tortious interference with a business expectancy must be dismissed because the pleaded facts do not support any of those causes of action. Moore also contends that the reintroduction of Interventional Pain Management Associates as a plaintiff is problematic because the statute of limitations bars the claims pleaded on behalf of that entity. The plaintiffs contend that the new claims by IPMA relate back to the original filing date (when IPMA was still a part of the case), *see* Fed. R. Civ. P. 15(c)(1)(B), and on that basis the second amended complaint was filed timely.

The Court assumes without deciding that the plaintiffs are correct on this point.  However, there are problems with the merits of all the plaintiffs' pleaded claims, considering both the second amended complaint and the proposed third amended complaint.

### A.  RICO

The plaintiffs allege that the defendants engaged in an unlawful civil conspiracy actionable under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.* "Enacted in 1970, the [RICO] Act prohibits one from engaging in 'a pattern of racketeering activity' in connection with 'any enterprise' whose activities affect interstate commerce." *Grow Michigan, LLC v. LT Lender, LLC*, 50 F.4th 587, 593 (6th Cir. 2022) (citing 18 U.S.C. § 1962(a)). "Breaking down those statutory components into consumable pieces, the statute defines a 'pattern of racketeering activity' as 'at least two acts of racketeering activity' that occur within ten years of one another." *Ibid.* (quoting 18 U.S.C. § 1961(5)). "'Racketeering activity' means any of a set of specified state and federal crimes set forth in § 1961(1)." *Ibid.*

Although the RICO act is primarily a criminal statute, its prohibitions may be enforced civilly.  "For parties seeking civil remedies, RICO creates a private cause of action: 'Any person injured in his business or property by reason of a violation of section 1962' may sue for treble damages and attorney's fees." *Ibid.* (quoting 18 U.S.C. § 1964(c)).  "Drawing from this textual backdrop, then, to state a civil RICO claim, a plaintiff must allege (1) two or more predicate racketeering offenses, (2) the existence of an enterprise affecting interstate commerce, (3) a connection between the racketeering offenses and the enterprise, and (4) injury by reason of the above." *Ibid.*

Because "proximate causation is an element of a RICO plaintiff's cause of action," the plaintiffs also must demonstrate "a proximate connection between its injury and the defendant's

conduct for purposes of pleading and proving a viable RICO claim." *Grow Michigan*, 50 F.4th at 593 (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006); *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 129 (2d Cir. 2003), *abrogated on other grounds by Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)). "Section 1964(c)'s causation standard — that the plaintiff suffer injury 'by reason of' the defendant's racketeering — is demanding. To satisfy this statutory requirement, a plaintiff, we have recently reaffirmed, must show 'that the defendant's violation was both a factual and proximate cause of his injury.'" *Id.* at 594 (quoting *Gen. Motors, LLC v. FCA US, LLC*, 44 F.4th 548, 559 (6th Cir. 2022)). "And proximate cause, as an aspect of RICO's 'by reason of' standard, has been understood to require a RICO plaintiff to show that the defendant's racketeering offense 'led directly to the plaintiff's injuries.'" *Ibid.* (quoting *Anza*, 547 U.S. at 461). "In that way, RICO's directness requirement elevates a plaintiff's burden by requiring more than a showing of mere foreseeability, the crux of common law causation principles." *Ibid.* (citing *Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 850 (6th Cir. 2003) ("Though foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury.")); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 348 (2d Cir. 2003) ("In fact, the proximate cause requirements of RICO [a]re more stringent than those of most states.")). "The concept is flexible but 'the causal link between the injury and the conduct may be too weak to constitute proximate cause [if] it is insubstantial, unforeseeable, speculative, or illogical, or because of intervening causes.'" *Collier v. LoGiudice*, 818 F. App'x 506, 511 (6th Cir. 2020) (quoting *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 614 (6th Cir. 2004)).

"Mail and wire fraud qualify as predicate acts under 18 U.S.C. § 1961." *Collier*, 818 F. App'x at 511 n.1 (citing 18 U.S.C. 1961(1), enumerating 18 U.S.C. § 1341 (mail fraud) and 18

U.S.C. § 1343 (wire fraud) as racketeering activity).  Violations of the Federal Identity Theft Act, 18 U.S.C. § 1028, also are enumerated as RICO predicate offenses.

1.  Existence of an "Enterprise"

RICO prohibits "racketeering activity" in connection with an "enterprise" whose activities affect interstate commerce.  "[T]he term 'enterprise' denotes any legal entity, such as a corporation, or 'any union or group of individuals associated in fact although not a legal entity.'" *Grow Michigan*, 50 F.4th at 593 (quoting 18 U.S.C. § 1961(4)).  In this case, the plaintiffs contend that defendant Blue Cross Blue Shield, through the person of its employee James Howell, and the MANTIS task force, under the direction of defendant Detective Lieutenant Marc Moore, formed an "association-in-fact" enterprise with the purpose of appropriating the assets of legitimate physicians through bogus prosecutions resulting in asset forfeitures and restitution.

"From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in *United States v. Turkette*, 452 U.S. 576 (1981), an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting 452 U.S. at 583).  "An association-in-fact enterprise can be proven by showing 1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

- 29 -

The difficulty for the plaintiffs is that they have not alleged any specific facts demonstrating that the association between the named defendants had any independent longevity or existed in any way apart from the alleged pattern of racketeering activity.

The complaints at least vaguely allege the existence of a "common purpose." However, there are no facts alleged establishing that there was any longevity in the association between Blue Cross and the MANTIS task force. Based on the facts presented in the various complaints, nothing more has been described beyond a single transactional interaction between singular employees of two independent entities for the purpose of undertaking a single investigation of Dr. Pompy's medical practice. Moreover, no facts at all are stated in the pleadings demonstrating that there was any independent existence of the association apart from the discrete acts of "racketeering activity" described in the complaint. For instance, there are no facts alleged from which one could draw an inference that the association-in-fact enterprise could "exist apart from the pattern of wrongdoing." *VanDenBroeck*, 210 F.3d at 699. Nor are there allegations suggesting "a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach." *Ibid.* The complaint here plausibly describes nothing more than a conspiracy to commit the several acts of "fraud" narrated in the pleadings, and nothing has been alleged to demonstrate that Blue Cross, MANTIS, or Moore and Howell formed any association that "functioned as a continuous unit" for purposes other than the incidental conspiracy alleged in this case, or that there was an independent organizational structure to the supposed "enterprise."

At oral argument, plaintiffs' counsel stated that he could allege that MANTIS and Blue Cross investigated another physician. That allegation would take the activity beyond this single alleged conspiracy. But there was no suggestion that either Blue Cross or MANTIS used any illegal means to conduct that investigation, or that there was anything untoward about it. Even

accepting counsel at his word, none of the allegations — made, proposed, or promised — are sufficient to establish an association-in-fact enterprise under RICO.

The plaintiffs allege that MANTIS is itself an enterprise. But there are no allegations, other than conclusory allegations, that it itself engaged in a pattern of racketeering activity or that it committed other unlawful acts beyond the investigation of the plaintiffs.

The second amended and proposed third amended complaints do not allege facts sufficient to establish this element of a RICO claim.

### 2. Racketeering Activity

The plaintiffs contend that defendants Blue Cross and Moore engaged in "racketeering activity" in several forms, all of which are related to the investigation of Dr. Pompy's medical practice. First, the plaintiffs allege that the defendants committed "wire fraud" and "mail fraud" by transmitting the search warrants that Moore obtained to financial institutions, which proceeded in accordance with those warrants to impair the plaintiffs' assets. "Mail and wire fraud qualify as predicate acts under 18 U.S.C. § 1961." *Collier*, 818 F. App'x at 511 n.1 (citing 18 U.S.C. 1961(1), enumerating 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) as racketeering activity). The crime of wire fraud consists of three elements: "(1) that the defendant devised or willfully participated in a scheme to defraud; (2) that he used or caused to be used an interstate wire communication in furtherance of the scheme; and (3) that he intended to deprive a victim of money or property." *United States v. Cunningham*, 679 F.3d 355, 370 (6th Cir. 2012) (cleaned up). "The crime of mail fraud has two elements: a scheme or artifice to defraud and a mailing for the purpose of executing the scheme." *Bender v. Southland Corp.*, 749 F.2d 1205, 1215-16 (6th Cir. 1984) (citing *Pereira v. United States*, 347 U.S. 1, 8 (1954)).

When pleading mail and wire fraud as underlying elements in the RICO context, the plaintiff must allege facts with particularity concerning the alleged misrepresentations.  *Bender*, 749 F.2d at 1216 ("Moreover, [Federal Rule of Civil Procedure] 9(b) requires that fraud be pleaded with particularity.  To satisfy [Rule] 9(b), a plaintiff must at minimum allege the time, place and contents of the misrepresentation(s).").

The plaintiffs' problem with this element is that, according to the pleaded facts, there were no "misrepresentations" involved in the specific communications described, which were confined to transmissions of the approved search warrants to the plaintiffs' financial institutions.  That is because it is undisputed that the search warrants in fact were issued by a state court magistrate, and there is no allegation that the defendants concocted documents purporting to be search warrants that were not in fact duly authorized by a magistrate.  The allegations in the pleadings instead focus on the defendants' preceding alleged misrepresentations made in the search warrant affidavits, which were submitted to the magistrate to obtain the warrants.  But those allegations sound in malicious prosecution, not "wire fraud" or "mail fraud," and malicious prosecution is not enumerated as an act of "racketeering activity" under RICO.

As one district court observed, after a survey of the decisions on point, "the overwhelming weight of authority bars a civil RICO claim based on the use of the mail or wire to conduct allegedly fraudulent litigation activities as predicate racketeering acts."  *Carroll v. U.S. Equities Corp.*, No. 18--667, 2019 WL 4643786, at *12 (N.D.N.Y. Sept. 24, 2019).  Numerous other federal courts similarly have held that malicious prosecution and other forms of litigation abuse do not constitute valid predicate acts for RICO conspiracy.  *E.g.*, *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 (11th Cir. 2004) ("In *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), the defendants allegedly threatened to sue a county government by falsely claiming that the County

Chairman had threatened violence against their abortion clinic. We held that neither the threat to litigate nor the fabrication of evidence behind the lawsuit made the action 'wrongful' within the meaning of 18 U.S.C. § 1951 and therefore could not be a predicate act under RICO."); *Verschleiser v. Frydman*, No. 22-7909, 2023 WL 5835031, at *13 (S.D.N.Y. Sept. 7, 2023) ("[T]o the extent the plaintiff makes specific allegations of litigation abuse that relate to the alleged RICO scheme against him, those allegations are insufficient to support the predicate acts at issue.") (collecting cases); *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 162 (D. Conn. 2000) ("These allegations at best amount to a vague abuse of process or malicious prosecution claim. Courts have found that allegations of malicious prosecution or abuse of process do not, on their own, suffice as predicate acts for a RICO violation.") (collecting cases).

Finally, for reasons discussed further below, there was nothing "fraudulent" about the procurement of the search warrants in the first instance, because the warrant affidavit attached to the second amended complaint discloses ample information establishing probable cause to search the plaintiffs' home and financial accounts for evidence of illegal drug distribution.

Finally, in his third amended complaint the plaintiffs propose to expand the RICO counts to allege further that Howell engaged in "identity theft" contrary to the Federal Identity Theft Act, 18 U.S.C. § 1028, violations of which also are an enumerated racketeering activity under 18 U.S.C. § 1961. The elements of identity theft are made out when a person "(1) knowingly transfers, possesses, or uses, (2) without lawful authority, (3) a means of identification of another person." *United States v. Jones*, 817 F. App'x 138, 140 (6th Cir. 2020) (cleaned up). It is acknowledged in this case — and explicitly alleged in the pleadings — that Howell's presentation of the fabricated documents was done at the behest of Moore and in connection with the criminal investigation undertaken by the MANTIS task force, which allegedly is a law enforcement agency under the

direction of the Michigan State Police.  The pleadings therefore negate any conclusion that Howell's use of the identification was done "without lawful authority," and the plaintiffs' proposed amendment still fails to describe any valid predicate acts of racketeering.

The second amended and proposed third amended complaints do not contain factual allegations that make out an alleged violation of, or conspiracy to violate, the RICO Act.

### B.  Fourth Amendment Claim

The plaintiffs allege that defendants Blue Cross and Moore conspired to violate their constitutional rights under the Fourth Amendment by agreeing to fabricate probable cause for search warrants that, once issued by a magistrate, resulted in the seizure of assets belonging to Dr. Pompy and his medical practice.  The plaintiffs invoke 42 U.S.C. § 1983.  To state a claim under that statute, a plaintiff must allege a violation of a right secured by the Constitution or laws of the United States by a person acting under color of state law.  *West v. Atkins*, 487 U. S. 42, 48 (1988).

The searches about which the plaintiffs complain were conducted with a warrant.  Current law "offers a 'complete defense' against [] claims [of an unreasonable search] when officers relied on a magistrate judge's warrant," but "this defense has two exceptions."  *Novak v. City of Parma, Ohio*, 33 F.4th 296, 305-06 (6th Cir. 2022) (citing *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010); *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020)).  "The first covers cases when an officer provides false information to obtain a warrant.  To [avoid this exception], [the plaintiff] must show that (1) the officers knowingly or recklessly made false statements or significant omissions; and (2) those 'statements or omissions were material, or necessary, to the finding of probable cause.'"  *Ibid.* (quoting *Sykes*, 625 F.3d at 305).  "[T]he second exception . . . applies if 'the warrant is so lacking in indicia of probable cause, that official belief in the existence of

probable cause is unreasonable.'" *Id.* at 306 (quoting *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989)).

The plaintiffs specifically identify only two discrete statements in the warrant affidavit that they says were misleading. First, the plaintiffs say that statements indicating that Dr. Pompy's prescribing volume was unreasonably high were misleading because the comparators used for the volume analysis all were anesthesiologists, not doctors practicing in clinical pain management. Second, the plaintiffs say that statements that Dr. Pompy inflated billing codes for certain patient visits were misleading because applicable Medicare policy statements do not tie billing codes inflexibly to "minutes of face time" spent during a visit, but instead allow some discretion for billing code determination by the physician based on other factors.

The search warrant affidavit was attached as an exhibit to the second amended complaint, and it spans 27 pages replete with incriminating details uncovered during the defendants' investigation. Search Warrant Aff., ECF No. 146-2, PageID.2360-87. Among other things, the affidavit documents the following.

First, defendant Moore attested that he had learned from records supplied by Blue Cross and records supplied by state and federal regulatory authorities that the plaintiff was a licensed medical doctor and the principal of plaintiff Interventional Pain Management Associates, and that various identified bank accounts were associated with the practice. Second, records indicated that the plaintiffs billed Blue Cross and other insurers for certain medical services purportedly furnished to pain management patients, and that Dr. Pompy also issued prescriptions for controlled substances including powerful narcotics.

Third, the affidavit recounted narratives of ten visits that Blue Cross employee James Howell had at Dr. Pompy's practice. Search Warrant Aff. at PageID.2363-2373. Those visits

occurred on various dates from January 2, 2016 through May 17, 2016. The reports indicated that during several appointments, Howell was seen by Dr. Pompy face to face for around one minute or less, that Dr. Pompy conducted no physical examination of Howell, and that he nevertheless issued or renewed prescriptions for controlled substances including Norco, Lyrica, and Zanaflex.

Fourth, the affidavit recounted medical reviews of Howell's patient history with Dr. Pompy by Dr. Carl Christensen, identified as a "consultant" for defendant Blue Cross. Search Warrant Aff. at PageID.2373-75. Dr. Christensen opined that there were several indications that the issuance of prescriptions for pain medications were not medically justified including (1) Howell's exhibition of "drug seeking behavior" in his repeated requests for refills and specific narcotics at the first visit and every following visit, (2) Howell's stated complaints of "stiffness" and "soreness" in his back which did not include any statements that he was suffering "pain," or any tangible indication of pain severity, (3) lack of any meaningful discussion between Howell and Dr. Pompy about any medical history of Howell's pain or possible causes of his back problems, (4) the lack of any physical examination performed by Dr. Pompy during visits when drugs were prescribed, (5) abnormal urine test results indicating the presence of several controlled substances that Howell had not reported having a prescription for, as well as the absence of metabolites from the drugs that Dr. Pompy had prescribed on prior occasions, and (6) lack of any discussion between Howell and Dr. Pompy about Howell's admissions to Dr. Pompy that he was consuming alcohol to excess to manage his discomfort. Dr. Christensen opined that Dr. Pompy's conduct during each visit where medication was prescribed violated the applicable standard of care and that the prescriptions were being issued without any legitimate medical purpose, based on the above anomalies.

Fifth, the affidavit reported an investigation of another suspect, Joshua Cangialosi, which occurred in April 2016.   Search Warrant Aff. at PageID.2375-76.   Moore was informed that Cangialosi had contact another MANTIS investigator, Detective Sean Street, and had offered to sell Street various prescription drugs including Suboxone, Xanax, Fentanyl, and Morphine.   Search Warrant Aff. at PageID.2376.   Street eventually conducted a controlled buy with Cangialosi and obtained units of a prescription spray containing Fentanyl.

After the transaction, Street identified himself as a police officer and detained Cangialosi. He subsequently entered Cangialosi's residence with consent and found two other occupants present therein, Vanessa Cangialosi and Ricky Bryant.   Joshua and Vanessa consented to a search of the residence and agreed to speak with Street after receiving *Miranda* warnings and waiving their rights to counsel.   Vanessa told Street that Bryant was her father, and that he was prescribed various narcotics, most of which he gave to Vanessa and Joshua to sell for a profit.   Bryant also consented to be interviewed and told Street that his physician, Dr. Pompy, had issued him recurring prescriptions for 120 units per refill of the Fentanyl spray.   Bryant kept 40 of the units and passed on the other 80 units to be sold.

Moore further attested that information from the manufacturer of the Subsys brand Fentanyl spray Bryant was prescribed indicated that it was intended exclusively for use by cancer patients with established opioid tolerance suffering "breakthrough pain," such that their pain could not be controlled even by the heaviest safe regimen of daily Morphine.   Furthermore, there were specific indications that the product was not to be used by any patients who were not on a continuous daily opioid regimen, due to the risk of fatal complications in non-opioid-tolerant patients.   Bryant had told Street that he did not have cancer and was prescribed the Fentanyl spray based solely on his diagnosis of Chronic Obstructive Pulmonary Disease (COPD), which is a lung

condition that causes breathing difficulty.  The manufacturer's literature did not indicate that Subsys was appropriate for treatment of COPD.  Moore further stated that Dr. Christensen had conducted a review of records relating to patients whom Dr. Pompy had prescribed the Subsys Fentanyl spray for, and none indicated diagnostic codes associated with cancer.  Dr. Christensen opined that "[t]he use of this potent opioid narcotic for patients without cancer, with the risk of addiction, overdose and death, is outside the standard of care."  *Id.* at PageID.2378.

Finally, the affidavit recounted surveillance by other MANTIS investigators on various dates during July and August 2016 documenting several occasions on which Dr. Pompy was seen leaving his medical practice with packages or bags, which Dr. Pompy transported to his home apparently to sequester the contents in the residence.

Dr.  Pompy has not pleaded any specific facts calling into question the veracity of any parts of the above narrative or the medical opinions stated by Dr. Christensen about the absence of medical justification for narcotics prescriptions that were issued to Howell, Bryant, and other patients who had been seen by Dr. Pompy.  In his pleadings, Dr. Pompy specifically takes issue only with those discrete statements that his "prescribing volume" was excessive for physicians in his area of practice and that he had used inflated billing codes based on the documented time spent with patients in certain visits.  *See* Search Warrant Aff. at PageID.2383-84.

This information, based on eyewitness accounts by two persons who visited Dr. Pompy's clinic and received prescriptions for powerful narcotic pain relievers, suffices to suggest a reasonable probability that Dr. Pompy was engaged in a pattern of issuing prescriptions for controlled substances without a legitimate medical purpose.  The statements concerning Pompy's overall prescribing volume and billing code abuses are at worst merely exaggerations about the significance of data reviewed by investigators.  But even if they were outright falsehoods, "a court

should set aside any false statement, or include any omission, in order to determine whether probable cause nonetheless exists, and an alleged misstatement or exaggeration of facts is insufficient to make a claim if other facts support the [] probable cause determination." *Buchanan v. Metz*, 647 F. App'x 659, 664 (6th Cir. 2016) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

After disregarding those discrete portions of the affidavit that the plaintiffs specifically challenge as misleading, the remainder of the unimpeached narrative amply supports a conclusion that probable cause was demonstrated to suspect Dr. Pompy of engaging in the issuance of illicit prescriptions for controlled substances.   The plaintiffs do not challenge the affidavit's establishment of a nexus to the places to be searched and assets to be seized, but the affidavit also sufficiently establishes reasonable grounds to believe that evidence of Dr. Pompy's illegal medical practices would be found at his clinic and his home, as well as in the records of financial accounts associated with the practice.

Considering the totality of the narrative in the search warrant affidavit, there was no deficiency in the probable cause showing, and the plaintiffs therefore cannot proceed on their claims of Fourth Amendment violations (Count 4).  The allegedly improper procurement of search warrants is the sole basis for the civil conspiracy claim pleaded in Count 3, and that claim consequently fails due to the corresponding failure plausibly to make out any claim of an underlying constitutional violation.  "In the absence of a viable underlying [constitutional] claim, [the plaintiff's] associated [] conspiracy claim necessarily fails." *Spearman v. Williams*, No. 22-1309, 2023 WL 7000971, at *5 (6th Cir. July 17, 2023) (citing *Stricker v. Township of Cambridge*, 710 F.3d 350, 365 (6th Cir. 2013); *Wiley v. Oberlin Police Dep't*, 330 F. App'x 524, 530 (6th Cir.

2009) (holding that a plaintiff cannot succeed on a conspiracy claim where "there was no underlying constitutional violation that injured her")).

### C. Tortious Interference Claim

The plaintiffs allege that defendants Blue Cross and Moore interfered with a valid business expectancy by causing Dr. Pompy's practice to be terminated from several other provider networks as a result of the issuance of the allegedly bogus search warrants. That claim is implausible because, (1) as discussed above, there was nothing improper about the issuance of the search warrants in the first instance, and (2) in any event the documentation attached to the complaints conclusively shows that the termination of provider relationships was not caused by the issuance or execution of any search warrants, but instead by Dr. Pompy's *arrest* on criminal charges of controlled substances distribution.

Under Michigan law, the elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy, (2) the defendant's knowledge of the relationship or expectancy, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the plaintiff. *Cedroni Ass'n, Inc. v. Tomblinson, Harburn Assocs., Architects & Planners Inc.*, 492 Mich. 40, 45, 821 N.W.2d 1, 3 (2012) (citing *Dalley v. Dykema Gossett, PLLC*, 287 Mich. App. 296, 323, 788 N.W.2d 679, 696 (2010)). For the first element, the plaintiff must show that the expectancy was "a reasonable likelihood or probability, not mere wishful thinking." *Cedroni*, 492 Mich. at 45, 821 N.W.2d at 3 (citing *Trepel v. Pontiac Osteopathic Hosp.*, 135 Mich. App. 361, 377, 354 N.W.2d 341, 348 (1984)) (quotation marks omitted). The third element requires a plausible allegation of an "intentional doing of a *per se* wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or

business relationship of another." *Formall, Inc. v. Cmty. Nat. Bank of Pontiac*, 166 Mich. App. 772, 779, 421 N.W.2d 289, 292 (1988) (quotation marks and citations omitted). The "plaintiff must demonstrate, with specificity, affirmative acts by the interferer which corroborate the unlawful purpose of the interference." *Id.* at 292-93.

The pleadings here do not plausibly describe the doing of any "*per se* wrongful act" or the commission of any "lawful act with malicious intent," because nothing more is alleged than that the defendants procured and executed search warrants that were supported by probable cause. Moreover, Dr. Pompy conspicuously does not challenge the basis of probable cause for his arrest on federal charges of drug and health care fraud offenses. Nor could he advance any such challenge at this point, since he was charged in an indictment issued by a grand jury on a finding of probable cause. *See Parnell v. City of Detroit, Michigan*, 786 F. App'x 43, 47 (6th Cir. 2019) ("[A] bindover determination after a preliminary hearing, or a grand jury indictment, proves the existence of probable cause sufficient to call for trial on the charge and forecloses a claim for malicious prosecution.") (citing *King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017)).

The specimens of termination letters that were attached to the complaint disclose that Dr. Pompy's medical practice was suspended from other provider networks due to his "arrest"; no mention is made of any "search" — either proper or improper — which is the entire focus of the instant litigation. *See* Letter dated Oct. 3, 2016 ("This summary suspension is pursuant to Policy No. CR18; Summary Suspension. HAP may initiate an immediate summary suspension against a HAP provider when the Chair of the Credentialing Committee is made aware that *the provider has been arrested or charged with a felony* and HAP believes that the provider's charges endanger[] the public health, safety or welfare of our members.") (emphasis added).

It also is axiomatic that causation is an inherent element of every claim of intentional tort, including interference with a business expectancy. *Vista Prop. Grp., LLC v. Schulte*, No. 347471, 2020 WL 5581751, at *7 (Mich. Ct. App. Sept. 17, 2020) ("[T]he third element of tortious interference . . . requires [a] showing of causation."). The pleadings in this case affirmatively demonstrate that the alleged harm of other providers' terminations of their relationships with the plaintiffs' medical practice was not caused by any allegedly wrongful conduct described in any version of the complaints.

The plaintiffs have failed to plead plausibly any underlying tortious act and also have failed adequately to plead facts to establish causation to support the claims for tortious interference (Count 6).

\* \* \* \* \*

For these reasons, Count 3, Count 4, and Count 6 of the second amended and proposed third amended complaints do not state claims upon which relief can be granted. Moore's motion to dismiss will be granted, and the motion to amend to add Dr. Pompy individually as a plaintiff in the Racketeering claims in Counts 1 and 2 against Blue Cross and Moore and join Blue Cross as a defendant in Counts 3 and 4 will be denied.

### IV.  Plaintiffs' Motion for Relief from Order Dismissing Claims Against Blue Cross and for Leave to File a Third Amended Complaint

The Court previously ordered that all the claims against defendant Blue Cross in Dr. Pompy's *pro se* first amended complaint be dismissed. *See* ECF No. 105, discussed at PageID.1612-16. He moves for relief from that order under Federal Rule of Civil Procedure 60(b), although he now concedes that the motion should be decided under Rule 54(b), since the previous order was interlocutory. Rule 15(a) applies to the motion to amend the second amended complaint.

"District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tennessee Laborers Health and Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004) (citations omitted). A party seeking that relief generally must show "(1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Ibid.* Motions to amend before trial are governed by Rule 15(a). Rule 15(a)(2) requires a party seeking to amend its pleadings at this stage of the proceedings to obtain leave of court. Although Rule 15(a)(2) says that "[t]he court should freely give leave [to amend] when justice so requires," leave may be denied for several reasons, including the futility of the proposed new claim. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999); *Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1997).

For all of the reasons discussed at length above in connection with the motions to dismiss by defendants Bishop and Moore, the plaintiffs have failed plausibly to plead any viable claims against any of the defendants named in this suit either presently or formerly.

The one claim that was not discussed is the breach of contract claim in Count 5. The Court previously held that it lacked jurisdiction over that claim and dismissed it without prejudice. ECF No. 105, PageID.1617-18. Blue Cross argued at the time that that the amended complaint did not state a valid breach of contract claim. But to reach that conclusion, the Court must have the authority to address the merits. Because the contract claim was a purely state-law claim between non-diverse parties, and it was not "related" within the meaning of section 1367(a) to a pleaded claim over which this Court has subject matter jurisdiction, the Court dismissed that claim without prejudice. The plaintiffs have not presented any good grounds either to revisit that ruling or to

permit the resurrection of the previously dismissed claim in the current posture of the case, where no viable claims for any other causes of action remain.

The plaintiffs' motion for relief from the prior dismissal orders and for leave to further amend the pleadings will be denied.

### V.  Defendant Blue Cross's Motion to Strike

Defendant Blue Cross argues that all of the claims in the second amended complaint pleaded against it should be stricken under Federal Rule of Civil Procedure 12(f) because (1) the Court dismissed all of the claims against Blue Cross with prejudice more than three years before the second amended complaint was filed, (2) when the magistrate judge held a conference with counsel for the remaining parties and subsequently granted leave to file a second amended complaint, he evidently intended to allow Dr. Pompy to bolster the pleadings against the surviving defendants, not to resurrect claims which had been dismissed years prior, and (3) Blue Cross did not consent to the filing of the second amended complaint, nor was leave granted by the Court to file a second amended complaint adding previously dismissed claims.

The plaintiffs respond that (1) nothing in the Court's April 2023 order "limited" or "conditioned" the scope of an amended pleading in any way, and the plaintiffs assumed therefore that they were free to replead any claims against any party that were not previously dismissed with prejudice, (2) the repleaded claims for RICO and civil conspiracy are brought solely by IPMA, which had its claims dismissed without prejudice due to its inability to retain counsel, unlike Dr. Pompy's claims, which were dismissed with prejudice, and (3) counsel's representation that he was working on winnowing claims against "remaining defendants" did not "rule out" the possibility that he also was considering resurrecting claims against previously dismissed parties. The plaintiffs further argue that none of the cases cited by the defendant involved *pro se* parties,

and the Court should not punish Dr. Pompy for his inability to previously retain counsel, which was caused by the defendants' allegedly wrongful seizure of his assets. The plaintiffs also contend that Rule 15(a) does not preclude renaming previously dismissed parties where leave to amend properly is granted, because the order of partial dismissal was not a "final order" under Rule 54, and therefore Blue Cross remained a party to the case after that order was entered.

All of the points argued in the plaintiffs' opposition to this motion are subsumed by the arguments in support of their combined motion for relief from the order dismissing claims against Blue Cross and for leave to file a third amended complaint rejoining BCBSM as a defendant and reasserting all of the previously dismissed claims. The Court addressed the merits of the claims in the proposed third amended complaint when it denied that motion, above. The claims against defendant Blue Cross do not survive. No further relief can be granted to this defendant by striking any pleadings. Therefore, this motion will be denied as moot.

### VI. Conclusion

After reviewing the allegations in the second amended complaint and the proposed third amended complaint, the Court must conclude that the plaintiffs have not pleaded, and will not be able to plead, facts in support of the theories of recovery that they outline in those pleadings.

Accordingly, it is **ORDERED** that the plaintiffs' motion for relief from order dismissing claims against Blue Cross and for leave to file a third amended complaint (ECF No. 171) is **DENIED**.

It is further **ORDERED** that the motions to dismiss by defendants Bishop and Moore (ECF No. 156, 157) are **GRANTED**.

It is further **ORDERED** that defendant Blue Cross Blue Shield's motion to strike (ECF No. 155) is **DENIED as moot**.

- 45 -

It is further **ORDERED** that all claims in the second amended complaint are **DISMISSED WITH PREJUDICE**, except the claim for breach of contract (Count 5), which is **DISMISSED WITHOUT PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   February 28, 2024